# EXHIBIT D

COUNTERPART AGREEMENT
OF
RANGERS BALLPARK LLC

June 13, 2007

This **COUNTERPART AGREEMENT**, dated June 13, 2007 (this "**Counterpart Agreement**") is delivered pursuant to that certain Amended and Restated First Lien Credit and Guaranty Agreement, dated as of December 19, 2006 (as it may be amended, amended and restated, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **HICKS SPORTS GROUP LLC** ("**Company**"), **HICKS SPORTS GROUP HOLDINGS LLC** and **CERTAIN SUBSIDIARIES OF THE COMPANY**, as Guarantors, the lenders party thereto from time to time (the "**Lenders**"), **JPMORGAN SECURITIES INC.**, as Joint Lead Arranger, Joint Bookrunner, and Co-Syndication Agent, **BARCLAYS CAPITAL INC.**, as Joint Lead Arranger and Joint Bookrunner, **BARCLAYS BANK PLC**, as Co-Syndication Agent, and **JPMORGAN CHASE BANK, N.A.**, as Administrative Agent and Collateral Agent.

**Section 1.** Pursuant to Section 5.10 of the Credit Agreement, the undersigned hereby:

(a)     agrees that this Counterpart Agreement may be attached to the Credit Agreement and that by the execution and delivery hereof, the undersigned becomes a Guarantor under the Credit Agreement and agrees to be bound by all of the terms thereof;

(b)     represents and warrants that each of the representations and warranties set forth in the Credit Agreement and each other Credit Document and applicable to the undersigned is true and correct in all material respects both before and after giving effect to this Counterpart Agreement, except to the extent that any such representation and warranty relates solely to any earlier date, in which case such representation and warranty is true and correct in all material respects as of such earlier date;

(c)     certifies no event has occurred or is continuing as of the date hereof, or will result from the transactions contemplated hereby on the date hereof, that would constitute an Event of Default or a Default;

(d)     agrees to irrevocably and unconditionally guaranty the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) and in accordance with Section 7 of the Credit Agreement; and

(e)     (i) agrees that this counterpart may be attached to the Pledge and Security Agreement, (ii) agrees that the undersigned will comply with all the terms and conditions of the Pledge and Security Agreement as if it were an original signatory thereto, (iii) grants to Secured Party (as such term is defined in the Pledge and Security Agreement) a security interest in all of the undersigned's right, title and interest in and to all "Collateral" (as such term is defined in the Pledge and Security Agreement) of the undersigned, in each case whether now or hereafter existing or in which the undersigned now has or hereafter acquires an interest and wherever the same may be located and (iv) delivers to Collateral Agent supplements to all schedules attached to the Pledge and Security Agreement. All such Collateral shall be deemed to be part of the "Collateral" and hereafter subject to each of the terms and conditions of the Pledge and Security Agreement.

**Section 2.** The undersigned agrees from time to time, upon request of Administrative Agent, to take such additional actions and to execute and deliver such additional documents and instruments as Administrative Agent

45919919.3

may request to effect the transactions contemplated by, and to carry out the intent of, this Agreement. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Agreement) against whom enforcement of such change, waiver, discharge or termination is sought. Any notice or other communication herein required or permitted to be given shall be given in pursuant to Section 10.1 of the Credit Agreement, and all for purposes thereof, the notice address of the undersigned shall be the address as set forth on the signature page hereof. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

[Remainder of page intentionally left blank]

2

45919919.3

IN WITNESS WHEREOF, the undersigned has caused this Counterpart Agreement to be duly executed and delivered by its duly authorized officer as of the date above first written.

RANGERS BALLPARK LLC

By:    Texas Rangers Baseball Partners,
       a Texas general partnership,
       its sole member

By:    HSG Partnership Holdings LLC,
       a Texas limited liability company,
       its Managing Partner

By:    _____
       Name:  Casey Shilts
       Title:  Executive Vice President
       and Secretary

Address for Notices:

       Rangers Ballpark LLC
       100 Crescent Court
       Suite 1200
       Dallas, Texas 75210
       Attention:  Joseph Armes and Casey Shilts

ACKNOWLEDGED AND ACCEPTED,
as of the date above first written:

JPMORGAN CHASE BANK, N.A.,
as Collateral Agent

By: _____
Name: RICHARD C. WALKER
Title: MANAGING DIRECTOR

45919919.3

3

Execution Document

# BALLPARK LEASE AGREEMENT

between

## ARLINGTON SPORTS FACILITIES DEVELOPMENT AUTHORITY, INC.,

as Landlord

and

## RANGERS BALLPARK LLC,

as Tenant

June 13 2007

TABLE OF CONTENTS

Page

ARTICLE I

Grant, Term of Lease and Certain Definitions

Section 1.1    Leasing Clause ................................................................................................. 3
Section 1.2    Term ................................................................................................................. 3
Section 1.3    Condition of Leased Premises, Denial of Warranties, Commitment of
               Non-Interference by the City............................................................................ 3
Section 1.4    Certain Definitions ........................................................................................... 4

ARTICLE II

Rental and Other Payments

Section 2.1    Rental. .............................................................................................................. 9
Section 2.2    Admissions Surcharge....................................................................................... 9

ARTICLE III

Impositions and Utilities

Section 3.1    Payment of Impositions.................................................................................. 10
Section 3.2    Contest of Impositions ................................................................................... 10
Section 3.3    Ad Valorem Taxes and Exemptions................................................................ 11
Section 3.4    Standing............................................................................................................ 13
Section 3.5    Utilities............................................................................................................ 13

ARTICLE IV

Improvements

Section 4.1    Improvement Rights; Rights to Alter and Demolish; Intellectual Property.......... 13
Section 4.2    Linear Park ..................................................................................................... 13
Section 4.3    Easements and Dedications............................................................................. 14
Section 4.4    Zoning and Other Governmental Approvals.................................................... 14
Section 4.5    Street Names ................................................................................................... 15

ARTICLE V

Use of Premises

Section 5.1    Use.................................................................................................................. 15
Section 5.2    Compliance with Laws.................................................................................... 16
Section 5.3    Maintenance. ................................................................................................... 16
Section 5.4    Operational Standards for Tenant ................................................................... 17

(i)

Case 10-04124-dml   Doc 1-5   Filed 07/16/10   Entered 07/16/10 18:04:21   Desc
Exhibit D   Page 7 of 61

Section 5.5   Operating Revenues ........................................................................... 18
Section 5.6   Major League Baseball Franchise........................................................ 18
Section 5.7   Access Rights of Emerald Diamond .................................................... 18

## ARTICLE VI

### Insurance and Indemnity

Section 6.1   Liability Insurance.............................................................................. 19
Section 6.2   Casualty Insurance ............................................................................. 19
Section 6.3   Policies ............................................................................................... 19
Section 6.4   Named Insureds; Adjustment of Losses.............................................. 20
Section 6.5   Application of Proceeds of Casualty Insurance ................................... 20
Section 6.6   Indemnity ........................................................................................... 20

## ARTICLE VII

### Assignment and Subletting

Section 7.1   Assignment......................................................................................... 21
Section 7.2   Subletting ........................................................................................... 21
Section 7.3   Nondisturbance Agreement................................................................. 21
Section 7.4   General Provisions .............................................................................. 22
Section 7.5   Rights to Use of Seats and Suites....................................................... 22

## ARTICLE VIII

### Leasehold Mortgages

Section 8.1   Leasehold Mortgage Permitted ........................................................... 22
Section 8.2   Notices to Leasehold Mortgagees ....................................................... 23
Section 8.3   Leasehold Mortgagee's Right to Cure ................................................. 23
Section 8.4   New Lease ........................................................................................... 24
Section 8.5   Leasehold Mortgagee's Liability ........................................................ 24
Section 8.6   No Modification or Surrender ............................................................. 25

## ARTICLE IX

### Default of Tenant

Section 9.1   Monetary Defaults by Tenant.............................................................. 25
Section 9.2   Non-monetary Defaults by Tenant. ..................................................... 25
Section 9.3   Cross-Defaults Under other Agreements ............................................ 26
Section 9.4   Remedies ............................................................................................ 26
Section 9.5   Dispute Resolution. ............................................................................ 26

(ii)
Dallas 1120590v.20

## ARTICLE X

### Default of Landlord

Section 10.1   Defaults ................................................................................................27
Section 10.2   Remedies ..............................................................................................27

## ARTICLE XI

### Condemnation

Section 11.1   Definitions ...........................................................................................28
Section 11.2   Efforts to Prevent Taking ....................................................................28
Section 11.3   Entire Taking ........................................................................................28
Section 11.4   Partial Taking .......................................................................................28
Section 11.5   Condemnation Award. ..........................................................................29
Section 11.6   Temporary Taking .................................................................................30
Section 11.7   Settlement of Proceedings ....................................................................30
Section 11.8   Exercise of Option ................................................................................30

## ARTICLE XII

### Representations, Warranties and Special Covenants

Section 12.1   Landlord's Representations, Warranties and Special Covenants ...........................31
Section 12.2   Tenant's Representations, Warranties and Special Covenants. ...........................33

## ARTICLE XIII

### Option To Purchase Property

Section 13.1   Grant of Option. ...................................................................................34
Section 13.2   Documents Provided to Tenant ............................................................35
Section 13.3   Tenant's Right to Extend or Disapprove ...............................................36
Section 13.4   Survey ....................................................................................................36
Section 13.5   Title Commitment .................................................................................36
Section 13.6   Title Exceptions ....................................................................................37
Section 13.7   Title Representations and Warranties by Landlord ...............................37
Section 13.8   Closing Date ..........................................................................................37
Section 13.9   Tenant's Obligation at Closing .............................................................38
Section 13.10  Landlord's Obligation at Closing ..........................................................38
Section 13.11  Closing Costs ........................................................................................38
Section 13.12  Condemnation .......................................................................................39
Section 13.13  Revocation by Tenant ...........................................................................39
Section 13.14  Landlord's Default .................................................................................39
Section 13.15  Tenant's Default .....................................................................................39
Section 13.16  No Assumption Of Liabilities ...............................................................39

Dallas 1120590v.20

Section 13.17  Scope of Option.................................................................................................39

## ARTICLE XIV

### Miscellaneous

Section 14.1    Inspection ........................................................................................................39
Section 14.2    Estoppel Certificates ........................................................................................40
Section 14.3    Release ............................................................................................................40
Section 14.4    Landlord's Right to Perform Tenant's Covenants ............................................40
Section 14.5    Tenant's Right to Perform Landlord's Covenants ............................................40
Section 14.6    Notices............................................................................................................41
Section 14.7    Successor and Assigns .....................................................................................42
Section 14.8    Modifications ..................................................................................................43
Section 14.9    Descriptive Headings ......................................................................................43
Section 14.10  Unavoidable Default and Delays.......................................................................43
Section 14.11  Partial Invalidity..............................................................................................43
Section 14.12  Applicable Law and Venue...............................................................................43
Section 14.13  Attorneys' Fees ...............................................................................................43
Section 14.14  Interpretation ..................................................................................................43
Section 14.15  Net Lease.........................................................................................................44
Section 14.16  Brokerage Commission ....................................................................................44
Section 14.17  Short Form.......................................................................................................44
Section 14.18  Monetary Obligations of Landlord....................................................................44
Section 14.19  Merger of Estates ............................................................................................44
Section 14.20  Landlord's Lien Waiver ...................................................................................44
Section 14.21  Waiver of Consequential Damages ...................................................................45
Section 14.22  Principles of Construction.................................................................................45
Section 14.23  Counterparts ....................................................................................................45
Section 14.24  Entire Agreement .............................................................................................45
Section 14.25  Exculpation......................................................................................................45

Dallas 1120590v.20

## BALLPARK LEASE AGREEMENT

This BALLPARK LEASE AGREEMENT (this "Lease") is executed as of the ___ day of June, 2007, by and between ARLINGTON SPORTS FACILITIES DEVELOPMENT AUTHORITY, INC. ("Landlord"), a non-profit industrial development corporation created under and governed by Section 4B of the Development Corporation Act of 1979, as amended (the "Act"), and Rangers Ballpark LLC ("Tenant"), and its successors or assigns, sometimes collectively referred to herein as the "Parties" or singularly as a "Party."

In consideration of the mutual covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged and confessed, Landlord and Tenant have agreed and do hereby agree as follows:

## RECITALS

A.  The City of Arlington (the "City") and The Texas Rangers, Ltd., whose successor-in-interest is Tenant, entered into that certain Master Agreement Regarding Ballpark Complex Development, dated December 4, 1990 (the "Master Agreement"). Tenant, as successor-in-interest to The Texas Rangers, Ltd., has responsibility for the obligations, and is entitled to the benefits, of The Texas Rangers, Ltd., under the Master Agreement.

B.  Pursuant to the Master Agreement, Landlord, as lessor, and Rangers Baseball, Inc. ("RBI"), as lessee and the affiliate of Tenant contemplated under the Master Agreement, entered into that certain Lease Agreement dated June 23, 1992, which Lease is evidenced of record by that certain Memorandum of Lease Agreement (the "Memorandum") dated as of June 23, 1992, by and between Landlord and RBI and recorded in Volume 10683, Page 1899 of the Real Property Records of Tarrant County, Texas (as amended by (i) that Reformation and First Amendment to Lease Agreement dated as of June 23, 1992, (ii) that Second Amendment to Lease Agreement dated January 24, 2006, and (iii) that Third Amendment to Lease Agreement dated October 16, 2006, (the "Prior Lease"), covering the leased premises described therein (the "Original Leased Premises").

C.  The entire leasehold interest in the Prior Lease was ultimately assigned by RBI to Tenant pursuant to (i) that Assignment and Assumption Agreement (Ground Lease) effective as of June 16, 1998, between RBI, as assignor, to D/S Real Estate, Inc. ("DSRE"), as assignee, and (ii) that Assignment and Assumption Agreement (Leases), dated as of June 16, 1998, between DSRE, as assignor, and Tenant, as assignee.

D.  Pursuant to the Master Agreement, Landlord, as optionor, and RBI, as optionee, entered into that certain Option Contract dated June 23, 1992, (the "Original Option Contract"), by which RBI was granted the right and option to purchase the Original Leased Premises, subject to certain payments and conditions.

E.  RBI's entire right, title and interest in the Original Option Contract was ultimately assigned by RBI to Tenant pursuant to (i) that Assignment and Assumption of Option Contract dated as of June 16, 1998, between RBI, as assignor, to DSRE, as assignee, and (ii) that Assignment and Assumption of Option Contract, dated as of June 16, 1998, between DSRE, as assignor, and Tenant, as assignee.

Dallas 1120590v.20

F.  The Original Option Contract was amended by the Dispute Settlement Agreement, as herein defined (the Original Option Contract, as so amended, is herein called the "Option Contract") and, on the date hereof, the Option Contract has been and is superseded and replaced by Article XIII of this Lease.

G.  The Ballpark and its related properties and facilities were designed and constructed by and under the direction of the predecessors in interest of Tenant under said agreements.

H.  To pay for a substantial portion of the capital costs of the Ballpark and its related properties and facilities, Landlord issued certain "Ballpark Obligations" pursuant to that Master Taxable Debt Resolution adopted on June 9, 1992 (Resolution No. 92-38), as supplemented by that Third Supplemental Taxable Debt Resolution adopted on May 9, 1995 (Resolution 95-28), and the Prior Lease contains various provisions relating to the Ballpark Obligations. The Ballpark Obligations were fully repaid on November 21, 2001.

I.  Pursuant to the authority and powers granted in Chapter 311, Tax Code, the City Council of the City, on June 6, 2007, adopted on second and final reading Ordinance No. 07-037 (the "Plan Ordinance") in which it established and provided for the implementation of the Glorypark Project Development Plan (the "Project Development Plan") and the Glorypark Project Financing Plan (the "Project Financing Plan") for City of Arlington Tax Increment Reinvestment Zone No. 5 (the "TIRZ") for the purpose of enhancing the taxable value of real property within the TIRZ and to provide general benefits to the City by improving and expanding access to and the uses of the land around the Ballpark that is currently used for surface parking purposes (the "Development Property") and to encourage and promote private development of and investment in the Development Property.

J.  The Plan Ordinance expressly requires and authorizes the City Manager of the City to execute the New Franchise Agreement, the Development Option Agreement, the Glorypark Project Development and Financing Agreement, the Development Property Lease, and the Structured Parking Lease, and requires and authorizes the Landlord to execute this Lease and the Centerfield Office Building Lease (as such terms are herein defined), subject to the approval of each such agreement by the City Council of the City.

K.  In order to fulfill and accomplish the objectives and requirements of the Plan Ordinance, the Landlord has conveyed the Development Property to the City subject to the Prior Lease and Option Contract, as amended, and the City and TRBP (as such term is herein defined) have agreed to execute the New Franchise Agreement, and the City, Landlord and Tenant, and BRE and Emerald Diamond have agreed to divide, amend, restate, and continue the Prior Lease and Option Contract, as amended, upon and subject to the terms and conditions set forth herein, in the Centerfield Office Building Lease, and in the Development Property Lease.

-2-

## ARTICLE I

### Grant, Term of Lease and Certain Definitions

Section 1.1    <u>Leasing Clause</u>.  Upon and subject to the terms, provisions and conditions herein set forth, Landlord does hereby LEASE, DEMISE and LET unto Tenant, and Tenant does hereby take and lease from Landlord, the Leased Premises, TO HAVE AND TO HOLD the Leased Premises, together with all rights, privileges, easements and appurtenances belonging to or in any way pertaining to the Leased Premises, for the term herein provided, upon and subject to the terms, conditions and agreements contained herein.

Section 1.2    <u>Term</u>.  The term hereof shall be for a period commencing on the Commencement Date (as herein defined) and terminating on April 11, 2024, unless earlier terminated in accordance with this Lease.

Section 1.3    <u>Condition of Leased Premises, Denial of Warranties, Commitment of Non-Interference by the City</u>.

(a)    Tenant expressly acknowledges, understands and agrees (i) that it takes and accepts the Leased Premises in their condition, location, and configuration on the Commencement Date, and (ii) that, except as otherwise expressly set forth in this Lease, Landlord does not make, and expressly disclaims, any representations, warranties, or guarantees as to the condition, usefulness, suitability for any use or purpose, and the useful life of any part and all of the Leased Premises, and Tenant hereby expressly continues, accepts and assumes possession of the Leased Premises upon and subject to such conditions.

(b)    The City, by its approval of this Lease, and by its acknowledgment of such approval where indicated below, agrees that it will not through direct intervention in the conduct of Tenant's ordinary and lawful business activities at the Ballpark, or through the exercise of its governmental powers, take voluntary actions that in either event are predominant factors (i) causing material disruption of Tenant's peaceful possession and quiet enjoyment of the Ballpark, as lessee under this Lease, for those uses and purposes permitted by this Lease as of the Commencement Date on a profitable basis, or (ii) materially impair the exercise of those uses and purposes permitted as of the Commencement Date and the profitable business and affairs of the Ballpark as an approved "project" under Act. If Tenant believes that the City has violated this provision, then Tenant shall have the right, at its cost and expense, to initiate and pursue the dispute resolution procedures in accordance with Exhibit A hereto.  If, as a result of such procedures, it is determined that the provisions of (i) or (ii) of this subsection have occurred, then the City shall have sixty (60) days during which the same can be corrected, failing which Tenant shall have the right, upon sixty (60) days' notice to the City and Landlord, concurrently with payment of all unpaid amounts under the Dispute Settlement Agreement, to terminate all, and not less than all, of the New Franchise Agreement in accordance with Section 2.4 thereof, this Lease (including specifically the Purchase Option), and the Centerfield Office Building Lease, but not the Development Property Lease, the Development Option Agreement, and the Structured Parking Lease,

-3-

and to surrender all of the properties leased under said leases to the Authority, without further liability of any nature or kind except for any unpaid monetary obligations that have accrued prior to such termination.

Section 1.4   Certain Definitions.  The following terms shall have the meaning set forth below in this Section 1.4 for all purposes hereof:

(a)   Act.  The Development Corporation Act of 1979, Article 5190.6, Tex. Rev. Civ. Stats. Ann., as amended, as aforesaid.

(b)   Admissions Surcharge.  The One Dollar ($1.00) surcharge to be collected by Tenant on behalf of Landlord for each admission ticket sold for major league baseball games held at the Ballpark, to be collected, held and applied as provided in Sections 2.2 and 5.3 hereof.

(c)   Ballpark.  The major league baseball park originally known as the "Ballpark in Arlington," and currently known as the "Rangers Ballpark in Arlington" and its appurtenant facilities located on the Ballpark Property, excluding the Centerfield Office Building.

(d)   Ballpark Property.  Lot 1, Block A of The Ballpark Addition of the City of Arlington, as shown on that replat of Block A of The Ballpark Addition filed in Cabinet A, Slide 8673A, in the plat records of Tarrant County, Texas, LESS AND EXCEPT the Centerfield Office Building.  Lot 1, Block A is bounded on the east side by Ballpark Way, bounded on the south side by Randol Mill Road, and bounded on the west side by Nolan Ryan Expressway.

(e)   BRE.  Ballpark Real Estate, L.P., a Texas limited partnership, and its successors or assigns.

(f)   BRE Land.  Lots 6C, 8 and 11 of Block A of The Ballpark Addition of the City of Arlington, as shown on the replat of Block A of The Ballpark Addition filed of record in Cabinet A, Slides 8673A and 8693 in the plat records of Tarrant County, Texas.

(g)   Centerfield Office Building.  That certain centerfield office building and land attached to the Ballpark and having an address of 1000 Ballpark Way, City of Arlington, Tarrant County, Texas, which is leased by Landlord to Emerald Diamond pursuant to the Centerfield Office Building Lease.

(h)   Centerfield Office Building Lease.   That certain Centerfield Office Building Lease Agreement attached to the Plan Ordinance as Exhibit E, dated of even date herewith between Landlord, as landlord, and Emerald Diamond, as tenant, in respect of the Centerfield Office Building, as the same may be amended or supplemented from time to time.

(i)   City.  The City of Arlington, Texas, a home rule city of the State of Texas.

(j)    Club Sublease.  That certain Amended and Restated Sublease Agreement dated as of June 16, 1998, effective as of January 1, 1995, between D/S Real Estate, Inc., as sublandlord, and TRBP, as subtenant, as assigned to BRE pursuant to that certain Assignment and Assumption Agreement (Leases), dated as of June 16, 1998, by and between D/S Real Estate, Inc., as assignor, and BRE, as assignee and amended by amendment dated October 31, 2001.

(k)    Commencement Date.  The date first above written, on which date this Lease has been fully executed by Landlord and Tenant.

(l)    Commissioner.  The office of the Commissioner of Baseball.

(m)    Development Option Agreement.    The Development and Option Agreement attached to the Plan Ordinance as Exhibit G.

(n)    Development Property.  The tracts of land in the vicinity of the Ballpark defined as the "Development Property" in the Development Property Lease.

(o)    Development Property Lease.    That Development Property Lease Agreement attached to the Plan Ordinance as Exhibit F, dated of even date herewith between the City, as landlord, and BRE, as tenant, in respect of the Development Property, as the same may be amended or supplemented from time to time.

(p)    Dispute Settlement Agreement.    That certain Dispute Settlement Agreement and Agreement Not to Pursue Claim, dated as of May 3, 1999, by and among Landlord, the City, Tenant, BRE and Emerald Diamond.

(q)    Emerald Diamond.  Emerald Diamond, L.P., a Texas limited partnership, and its successors or assigns.

(r)    Escrow Agreement.    That Second Amended and Restated Escrow Agreement dated June (City Manager to insert date), 2007, among Landlord, Tenant, BRE, and JPMorgan Chase Bank, as escrow agent, providing for the collection, escrow and disbursement from time to time of the Admissions Surcharge.

(s)    Franchise.  The rights of TRBP to field and operate the Team as a competing member team of the League.

(t)    Franchise Obligations.  The obligations of TRBP to the League as owner of the Franchise.

(u)    Glorypark Project Development and Financing Agreement.    The Glorypark Project Development and Financing Agreement attached to the Plan Ordinance as Exhibit H.

(v)    Impositions.    Taxes, special assessments, levies and liens for any construction performed by or at the direction of Tenant, or its affiliates (other than liens which are payable by Landlord pursuant to written agreements executed by Landlord),

assessed and becoming due during the Term against the Leased Premises and any and all Improvements now or hereafter located thereon; provided, however, that building permit expenses and associated construction-related fees (such as impact fees and tap fees) shall be expressly excluded from the term "Impositions."

(w)    Improvements.  All buildings, structures and improvements from time to time connected, installed or situated on the Leased Premises, and other real and personal property associated therewith from time to time situated on the Leased Premises, including the Ballpark.

(x)    Incremental Funding.    The incremental funding for the Ballpark contributed from funds received by Tenant or its affiliates from the lease or sale of luxury suites or seat options in the Ballpark, which incremental funding is comprised in part by that indebtedness incurred by Landlord pursuant to that Subordinate Lien Note and Bond Resolution adopted on December 22, 1992 (as amended February 2, 1993, by Resolution No. 93-06) by Landlord (Resolution No. 92-89), as supplemented by (i) Second Supplement to the Subordinate Lien Note and Bond Resolution adopted by Landlord on April 15, 1997 (Resolution No. 97-05), and (ii) Third Supplement to the Subordinate Lien Note and Bond adopted by Landlord on October 13, 1998 (Resolution No. ASFDA 98-10).

(y)    Incremental Funding Documents.  All documents, instruments or other agreements evidencing, securing, governing or otherwise pertaining to the Incremental Funding, or any portion thereof.

(z)    Insurance Trustee.  Any bank, insurance company or financial institution selected by any Leasehold Mortgagee or, in the event there is no Leasehold Mortgagee, by the mutual agreement of Landlord and Tenant, to collect all money payable under any insurance policy pursuant to Section 6.5 hereof.

(aa)    Land Exchange Agreement.  The agreement by that name attached to the Plan Ordinance as Exhibit J.

(bb)    League.  Means (i) the Office of the Commissioner of Baseball, an unincorporated not-for-profit association doing business as Major League Baseball, or (ii) any successor professional baseball league in which the Team shall be a member.

(cc)    Lease.  This Ballpark Lease Agreement by and between Landlord, as landlord, and Tenant, as tenant, covering the Leased Premises.

(dd)    Lease Year.  Each twelve (12) month period during the Term hereof, with the first Lease Year beginning on (City Manager to insert date), 2007, and each subsequent Lease Year beginning on the next successive annual anniversary of such date.

(ee)    Leased Premises.  The Ballpark Property, together with all present and future Improvements on the Ballpark Property including, without limitation, the Ballpark, and other rights, privileges, easements and appurtenances benefiting, belonging to or in any way appertaining thereto including, but not limited to (i) any and all rights,

-6-

privileges, easements and appurtenances of Landlord as the owner of fee simple title to the Ballpark Property, or any portion thereof, now or hereafter existing in, to, over or under adjacent streets, sidewalks, alleys and property contiguous to the Ballpark Property, (ii) reversions which may hereafter accrue to Landlord as owner of fee simple title to the Ballpark Property, or any portion thereof, by reason of the closing or re-alignment of any street, sidewalk or alley or the abandonment of any rights by any governmental authority, and (iii) any and all strips and gores relating to the Ballpark Property, or any portion thereof, save and except 100% of the rights, titles and interests in all oil, gas and other minerals in, under, produced from or constituting part of the Ballpark Property (whether such minerals are considered part of the surface estate or mineral estate), which rights are hereby reserved by the Landlord.

(ff)    Leasehold Mortgage.  Any mortgage, deed of trust, or other instrument in the nature thereof which encumbers Tenant's leasehold interest in the Leased Premises and any of Tenant's rights, titles and interests hereunder relating to the Leased Premises, including (without limiting the generality of the foregoing) Tenant's right to use and occupy the Leased Premises and Tenant's rights, titles and interests in and to any and all buildings, other improvements and fixtures now or hereafter placed on the Leased Premises.

(gg)    Leasehold Mortgagee.  Any mortgagee, trustee, or anyone that claims an interest by, through or under a Leasehold Mortgage.

(hh)    Linear Park.  The linear public park owned by the City and known as the Richard Greene Linear Park, which is located along that portion of Johnson Creek that transverses the Development Property.  The Linear Park contains and throughout the Term is anticipated to contain, among other things, jogging and biking trails and picnic areas designed to create a river-walk atmosphere and an overall environment that is compatible with the family atmosphere and design of a major league baseball park.  The Linear Park is not part of the Development Property or the Leased Premises.

(ii)    Mortgaged Premises.  All of Tenant's leasehold estate under this Lease, or under a new lease as defined and as provided in Article VIII hereof, as applicable, covered by a Leasehold Mortgage.

(jj)    Name Sponsor.  Each sponsor for which the Leased Premises (or portions thereof or Improvements thereon) is named from time to time.

(kk)    New Franchise Agreement.  That certain agreement between Tenant, as owner of the Franchise, on the one hand, and the City, on the other hand, dated the Commencement Date, in which Tenant, as owner of the Franchise, subject to its other terms and conditions, agrees to continuously operate the Team as a member team of the League and to play the Team's home games at the Ballpark until April 11, 2024, and until April 11, 2034, if the Option is exercised.

(ll)    New Transaction Documents.  Collectively, this Lease, the Development Property Deed, the Centerfield Office Building Lease, the Development Property Lease,

-7-

the New Franchise Agreement, the Development Option Agreement, the New Convention Center Parking Agreement, the Land Exchange Agreement, and the Glorypark Project Development and Financing Agreement.

(mm)  Nondisturbance Agreement.  An agreement between Landlord and any Subtenant of any portion of the Leased Premises as required by and conforming with the provisions of Section 7.3 hereof

(nn)  Option.  Has the meaning set forth in Section 13.1(a) hereof.

(oo)  Option Price.  The purchase price to be paid if the Option is exercised and the purchase of the Purchase Property is closed in accordance with Article XIII hereof.

(pp)  Rental.  The rental for the use and occupancy of (a) the Leased Premises, (b) the Centerfield Office Building under the Centerfield Office Building Lease, and (c) the Development Property under the Development Property Lease, all as provided in Section 2.1 hereof, for the time period provided therein.

(qq)  Seats.  Those certain seats in the Ballpark which shall be subject to certain rights and options granted by Landlord entitling the owner and holder of such rights and options to purchase season tickets to the regular and championship season home games of the Team, and to certain other events in the Ballpark, all as more fully provided in the Incremental Funding Documents.

(rr)  Structured Parking Facilities.  The portion of the Public Improvements to be provided under the Plans and the Structured Parking Lease for public parking for events at the Ballpark and other developments within the area.

(ss)  Structured Parking Lease.  The Structured Parking Lease Agreement attached as Exhibit 3 to the Development Financing Agreement.

(tt)  Subtenant.  Any person or entity to whom or to which Tenant grants or licenses any rights to occupy, use, operate or manage all or any portion of, or provide or sell food, beverages, services, merchandise or goods within, the Leased Premises, including, without limitation, any Name Sponsor.

(uu)  Suites.  Those certain luxury suites in the Ballpark which shall be subject to certain rights of use granted by Landlord, all as more fully provided in the Incremental Funding Documents.

(vv)  Team.  The "Texas Rangers Baseball Club," a member baseball team of the League pursuant to the rights granted by the League to TRBP pursuant to the Franchise.

(ww)  Term.  The term hereof as provided in Section 1.2.

(xx)  TRBP.  Texas Rangers Baseball Partners, a Texas general partnership owning the Team.

(yy)   Zoning District Ordinance.  Ordinance No. 07-038, adopted by the City Council of the City on second and final reading on June 5, 2007, creating a planned development zoning district encompassing the Development Property.

## ARTICLE II

### Rental and Other Payments

Section 2.1    Rental.

(a)    Tenant shall pay to Landlord Rental under this Lease for (i) the use and rights of occupancy of the Leased Premises by Tenant under and in accordance with this Lease, (ii) the use and rights of use of Centerfield Office Building by Emerald Diamond under and in accordance with the Centerfield Office Building Lease, and (iii) the use and rights of use of, and rights to acquire title to, the Development Property by BRE under and in accordance with the Development Property Lease and the Development Option Agreement, all as permitted and provided in the Plan Ordinance.

(b)    The Rental for the use and occupancy of all of said properties is $2,000,000.00 per annum throughout the Term, payable in equal monthly installments of $166,666.66 on the first day of each month; provided that if the Commencement Date is not the first day of a month, the installment of Rental for that month shall be reduced on a pro rata basis according to the number of days remaining in that month.  If this Lease terminates on a day other than the anniversary of the Commencement Date, the Rental for such partial year shall be proportionately reduced and the remaining Rental shall be payable, or the excess portion of Rental previously paid shall be refunded, as applicable, on such date of termination.

(c)    Landlord acknowledges and agrees that the Rental required to be paid by this Section constitutes full and adequate consideration and payment for the use and occupancy of the Leased Premises under this Lease, and of the Centerfield Office Building under the Centerfield Office Building Lease, and of the Development Property under the Development Property Lease, and that no additional payments of rent under those leases is or shall be required so long as the Rental is paid under this Lease on a full and timely basis.  The lessees under said leases may at any time and under any circumstances cite such payments, if paid at the times and in the amounts herein required, as full consideration for their use and occupancy of the premises leased under said leases.

Section 2.2    Admissions Surcharge.

(a)    Tenant shall cause the owner of the Team to continue collecting throughout the Term, the Admissions Surcharge on all paid admission tickets to major league baseball games of the Team and Major League Baseball special games held at the Ballpark.  The Admissions Surcharge so collected for each calendar year shall be deposited to an escrow account at JPMorgan Chase Bank, to be held and disbursed by JPMorgan Chase Bank in accordance with the Escrow Agreement, until such time as the Incremental Funding is fully repaid, after which time Tenant (or its Subtenant) may cause

the owner of the Team to continue to collect and retain the Admissions Surcharge for so long as Tenant may desire, for application to the maintenance of the Ballpark under Section 5.3 below. Such deposits shall be made on or before the fifth business day of each month following a month in which the Admissions Surcharge is collected. The aggregate amount of the Admissions Surcharge for each calendar year, in no event to exceed Two Million Dollars ($2,000,000.00), has been pledged as security for the payment of the Incremental Funding and such portion of the Admissions Surcharge shall be applied by JPMorgan Chase Bank to the payment of the Incremental Funding in accordance with the Incremental Funding Documents. All amounts of the Admissions Surcharge for any calendar year not actually applied to the payment of the Incremental Funding as herein provided shall not be subject to the liens contemplated in this Section and shall be applied to the maintenance of the Ballpark under Section 5.3 below. Tenant does not make any representations or warranties, either express or implied, as to the aggregate amount of the Admissions Surcharge which will be raised or that it will equal or exceed $2,000,000.00 in any calendar year.

(b)    If, at any time, either before or at the maturity date of the Incremental Funding, the amount of the Admissions Surcharge that has been deposited to the escrow account in accordance with subsection (a), above, is less than the amount required to pay all maturing Incremental Funding, when due, the Tenant and/or the Team shall deposit, within ten (10) business days after notice from the City of such deficiency and from any source required, the amount of money needed to pay all maturing Incremental Funding when and as due and payable.

## ARTICLE III

### Impositions and Utilities

Section 3.1    Payment of Impositions. Except as provided elsewhere in this Article III, Tenant shall pay all Impositions before the same become delinquent, and Tenant shall at the request of Landlord furnish to Landlord receipts or copies thereof showing the payment of such Impositions. Tenant shall be entitled to pay any Impositions in installments as and to the extent the same may be permitted by the applicable taxing authority or claimant. Landlord agrees to cooperate with Tenant in seeking the delivery of all notices of Impositions to Tenant directly from the applicable taxing authorities. In no event shall Tenant be in default under this Lease for failure to pay any Impositions before the same become delinquent for which the notice of such Impositions shall have been delivered to Landlord and not forwarded or delivered to Tenant at least thirty (30) days before the date the same become delinquent.

Section 3.2    Contest of Impositions. If the levy of any of the Impositions shall be deemed by Tenant to be improper, illegal or excessive, or if Tenant desires in good faith to contest the Impositions for any other reason, Tenant may, at Tenant's sole cost and expense, dispute and contest the same and file all such protests or other instruments and institute or prosecute all such proceedings for the purpose of contest as Tenant shall deem necessary or appropriate; provided, however, that Tenant shall not permit any lien which may be imposed against the Leased Premises for contested Impositions to be foreclosed and, at or prior to any such contest, Tenant shall adequately indemnify or secure Landlord thereof to its reasonable

-10-

satisfaction. Subject to the foregoing, any item of contested Imposition need not be paid until it is finally adjudged to be valid. Tenant shall be entitled to any refund of any Imposition that had been theretofore paid by Tenant. Landlord shall be entitled to any refund of any Imposition that had been paid by Landlord, less any costs of Tenant expended by it in pursuit of the right to receive such refund.

Section 3.3    Ad Valorem Taxes and Exemptions.

(a)    Landlord and Tenant acknowledge, reconfirm, and restate their prior determinations and claims that the land and the existing improvements comprising the Leased Premises, including the leasehold interest of Tenant under the Prior Lease and hereunder, for so long as the Leased Premises are owned by Landlord on behalf of the City, or are owned by the City, and are used as a "project" under the Act as originally enacted, will continue to be exempt from ad valorem taxes as exempt properties under the current and applicable provisions of the Texas Constitution, the Texas Tax Code, Section 4B of the Act, and other applicable laws of the State of Texas. So long as applicable law relating to the tax exempt status of the Leased Premises remains unchanged from the date of this Lease, Tenant is authorized to assert, insist upon, continue, and restate this joint determination and claim in any agency, forum, or court having jurisdiction and at which the question may arise or be presented, and Landlord, at the request and expense of Tenant, agrees, if requested by Tenant and assuming Landlord has legal standing to do so, to jointly take and pursue such lawful actions with Tenant, including, if necessary, judicial actions, as may be available and appropriate, to protect and defend the Leased Premises as initially named and used as a "project" under Section 4B of the Act, as originally enacted, and the leasehold interest of Tenant therein, against the levy, assessment or collection of ad valorem taxes by any governmental agency having the power and required to levy, assess, and collect such taxes under currently applicable law.

(b)    If, pursuant to the authority granted to Tenant under Section 4.1 of this Lease, Tenant elects to construct improvements to the Leased Premises in addition to the improvements located thereon on the Commencement Date or to alter, add to, or modify the uses of any portion of the Leased Premises, Tenant may, at its option, assert or claim that the altered, additional, or modified uses of the Leased Premises also constitute "projects" under the Act or that, for other legal reasons constitute "exempt properties" under applicable law and are exempt from ad valorem taxation in any agency, forum, or court and in accordance with any procedures for claiming such exemptions as are permitted by applicable law, including the Tarrant County Central Appraisal District and the subsequent administrative and judicial procedures that are currently or in the future permitted by the Texas Tax Code. If Tenant claims any such exemptions in any such request or proceeding, Landlord shall provide such verifications and certifications showing its ownership of the fee title to the Leased Premises and the improvements thereon and shall, at Tenant's sole expense, otherwise reasonably cooperate in such contest, to the extent reasonably requested by Tenant. If, after making any application to any agency or body having jurisdiction, any administrative determination that is adverse to Tenant's claimed exemption may be contested by Tenant in any proper court or forum in any manner provided by law so long as Tenant takes all action necessary or, in the

-11-

reasonable opinion of Landlord, desirable to protect the Leased Premises, or any part thereof, from foreclosure of any liens for taxes. In the event of a failure of such contest, and if the planned improvements are finally found and determined not to be exempt and to be subject to ad valorem taxation, Tenant shall pay such taxes before the same become delinquent, subject to Tenant's general right of contest contained in Section 3.2.

(c)   Landlord and Tenant acknowledge and agree that certain benefits accrue to Landlord and Tenant by virtue of Landlord's ownership of fee title to the Leased Premises and that such benefits are material inducements to Landlord and Tenant to enter into this Lease. Accordingly, Landlord covenants and agrees that, during the Term of this Lease and any renewals or extensions thereof, and prior to the termination of this Lease, it will at all times own and hold title to the Leased Premises, as encumbered by this Lease, for the benefit of and on behalf of the City in accordance with Section 4B of the Act, and further covenants and agrees that it will not sell, transfer or otherwise convey all or any portion of the Leased Premises to any person or entity, other than to the City if required by the City under the articles of incorporation of Landlord, without the prior written consent of Tenant. Landlord will give Tenant at least sixty (60) days prior written notice of any proposed transfer of all or any portion of the Leased Premises. If any such transfer threatens to result or actually results in the imposition of any ad valorem tax liability against the Leased Premises or Tenant, Tenant (and its affiliates) shall have the right to offset Rental payments by the amount of any such tax liability and to obtain an injunction prohibiting any such transfer.

(d)   Landlord further agrees not to take any action that may cause the levy, assessment or collection of any such ad valorem taxes. If, for any reason, it should be finally determined that the interests of Landlord or Tenant in and to the Leased Premises and/or any of its properties and facilities, as they are configured and used on the Commencement Date, are no longer exempt from taxation by reason of a change of law or otherwise, then Tenant shall pay such taxes before they become delinquent, subject to Tenant's right of contest as provided in Section 3.2 of this Lease, and the aggregate amount of such taxes owing and paid to the City, but not to other taxing jurisdictions, throughout the Term of this Lease shall be applied as a credit against each of (i) the Rental due under this Lease in the order of the next maturing installments, and (ii) the Option Price.

(e)   Notwithstanding anything to the contrary contained herein, all amounts, if any, paid by Tenant for any occupancy, succession, or transfer tax levied by the federal, state, or any local government, including Landlord or the City, upon or with respect to Tenant's occupancy or transfer of its leasehold interest in the Leased Premises, or any sale, excise or use taxes, if any, imposed on or with respect to the Rental paid to Landlord, shall also be applied as a credit against each of (A) the Rental due under this Lease in order of the next maturing installments, and (B) the Option Price.

(f)   Notwithstanding anything to the contrary, if Landlord undertakes any action (i) requested by Tenant under this Section 3.3, or (ii) that is to be performed at Tenant's cost or expense as provided for in this Lease, then Tenant shall pay all third-party costs, including outside attorney fees and expenses, reasonably incurred by

-12-

Landlord, or, within thirty (30) days after written demand therefor, reimburse such costs to Landlord; provided that Landlord has notified Tenant in writing of the anticipated amount of such costs prior to incurring any costs.  Notwithstanding the foregoing, Landlord shall be responsible for its own internal administrative and legal expenses associated therewith.

Section 3.4    Standing.  If Tenant determines that Tenant lacks standing to contest any Impositions or to obtain an extended payment period, Landlord (to the extent otherwise allowed by law) shall join in such contest, at Tenant's sole cost and expense, or otherwise provide Tenant with sufficient authority to obtain such standing (to the extent otherwise allowed by law).

Section 3.5    Utilities.  Tenant shall pay all bills for utilities furnished to the Leased Premises, including, but not limited to, bills for water, electricity, gas, telephone and sewer.

## ARTICLE IV

### Improvements

Section 4.1    Improvement Rights; Rights to Alter and Demolish; Intellectual Property. Tenant shall have the right, at its option and in its sole discretion (subject only to the express restrictions set forth in this Lease), to develop portions of the Ballpark Property, and to erect buildings and other improvements on the Ballpark Property, and to alter, add to, reconstruct, remodel or demolish as often as and whenever Tenant deems proper or desirable the Ballpark or other Improvements and to devote the same for any lawful uses and purposes, as long as such development, demolition, reconstruction, and remodeling does not materially interfere with the operation of the Ballpark as a "project" under the Act and for its intended purposes as the home field professional sports venue for the Team pursuant to the New Franchise Agreement and this Lease.  Title to all buildings and permanent improvements constructed on the Ballpark Property shall immediately vest in Landlord and shall continue to reside with Landlord so long as this Lease applies to the Ballpark Property on which such buildings and permanent improvements are constructed.  If Tenant (or the Team, or any affiliate thereof or any licensee or subtenant of Tenant) physically attaches any fixtures or other items to the Ballpark which are not essential for the reasonable operation of the Ballpark as a "project" under the Act, such items may be removed from the Ballpark upon the expiration or termination of this Lease.  For purposes of illustration, and not limitation, stadium light fixtures, the Daktronics Board, spectator seats, toilets and sinks, are essential items, while video monitors, plasma televisions, athletic training equipment, physical therapy equipment and sponsor signs are not essential items.  Tenant shall patch any holes or otherwise repair any damage to the Ballpark caused by Tenant's removal of any non-essential items.  Tenant (or its affiliate) and not Landlord shall own all intellectual property rights in, and relating to, the Ballpark, whether now in existence or created in the future, including, without limitation, all copyrights, trademarks, trade dress and merchandising rights in the Ballpark, all names, logos and likenesses, as well as the rights to protect, enforce and license any or all of the foregoing.

Section 4.2    Linear Park.  The Linear Park is not leased to Tenant and shall at all times be and remain in the public domain as part of the City's public facilities, operated and maintained by the City at the City's sole expense, for public use and purposes, and with any and

-13-

all revenues therefrom accruing directly to the City. Only such commercial entertainment or attractions as shall have been mutually approved by the City and Tenant shall be permitted within the Linear Park or any of the City's other parks or public facilities adjoining the Leased Premises.

Section 4.3    Easements and Dedications.   In order to repair, restore or operate the Ballpark or further improve portions of the Ballpark Property, it may be necessary or desirable that street, water, sewer, drainage, gas, power lines, set back lines, and other easements, and dedications and similar rights be granted or dedicated over or within portions of the Leased Premises or the Linear Park (or any of the City's other parks or public facilities now or hereafter adjoining the Leased Premises), by plat, replat, grant, deed or other appropriate instrument. Landlord shall, on written request of Tenant and to the extent necessary as fee owner of the Leased Premises, join with Tenant in executing and delivering, and use its reasonable best efforts to cause the City to execute in its capacity as owner of the Linear Park (or any other park or public facility adjoining the Leased Premises) as opposed to its governmental capacity, such documents, from time to time throughout the Term, as may be appropriate or necessary for the repair, restoration and operation of the Ballpark and development, construction or operation of other Improvements on the Ballpark Property. In no event shall Landlord grant any easements and dedications within the boundaries of the Ballpark Property without the prior written consent of Tenant.

Section 4.4    Zoning and Other Governmental Approvals.   In the event that Tenant deems it necessary or appropriate to obtain use, zoning, site plan approval or any permit from the City, or any other governmental entity having jurisdiction over the Ballpark Property or any portion thereof or interest therein in order to continue the uses of the property for the purposes permitted hereby, Landlord agrees, from time to time, on request of Tenant and to the extent necessary as fee owner of the Leased Premises, to execute such documents, or join in such petitions, applications and authorizations as may be appropriate or requested by Tenant and to cooperate in good faith with Tenant in all such efforts. Without limiting the generality of the foregoing, Landlord shall reasonably cooperate (without being obligated to incur any expense) with Tenant's efforts to develop and use the Leased Premises as part of a planned development located within the zoning district created pursuant to the Zoning District Ordinance. During the Term, Landlord shall not claim or attempt to exercise any rights, powers, privileges or benefits arising under the Zoning District Ordinance in favor of an owner or developer of property within the zoning district, without Tenant's prior written consent in each instance. Furthermore, during the Term, Landlord shall not create any restrictions, covenants, conditions, easements, parking rights, access agreements, licenses, subleases or any other agreements or encumbrances of any kind benefiting or burdening any portion of the Leased Premises (each a "Restriction" and collectively, the "Restrictions"), and shall not consent to any modification, amendment, termination, extension or other change in any Restriction that is in effect on the Commencement Date, whether recorded or unrecorded, or grant or withhold any consent or approval, exercise any rights or remedies, or take any other action under or in respect of any Restriction, without Tenant's prior written consent in each instance. Landlord shall reasonably cooperate with Tenant's efforts to enforce the Restrictions during the Term (without being obligated to incur any expense).

-14-

Section 4.5    <u>Street Names</u>.   Landlord acknowledges that it may be desirable and appropriate for streets and roadways outside of, but adjacent to, the Ballpark Property, to be named or renamed, from time to time, with names suggested by Tenant and approved by Landlord and the City to identify, locate or otherwise promote the Ballpark or its components. Street names suggested by Tenant may include, without limitation, names in honor of the Team, names in honor of individuals associated with the Team, or other names inspired by sports, entertainment or the community in general.   Landlord agrees, from time to time, upon request of Tenant, to use its reasonable best efforts to cause the City to provide permits, variances and authorizations required by applicable rules, regulations and ordinances for all such names (and signage therefor) as may be reasonably requested by Tenant, to the extent permitted by applicable law.   Prior to naming the southwest extension of Baird Farm Road constructed on the Released Tracts the City shall seek input from Tenant and shall reasonably cooperate with Tenant to select a name acceptable to the City. Tenant shall pay the cost for producing and installing any street sign requested by Tenant.

## ARTICLE V

### Use of Premises

Section 5.1    <u>Use</u>.

(a)      Throughout the Term, Tenant shall use the Leased Premises for the principal purpose of conducting home baseball games of the Team in accordance with League rules, and Tenant may also use the Leased Premises for hosting sports, entertainment and other public events, which may or may not be related to the Team, and for any other lawful purposes that do not materially interfere with the principal purpose of the Ballpark as a major league baseball facility.   In connection with such principal purpose, Tenant may authorize related activities by spectators of sports and entertainment events at the Ballpark, such as environmentally safe activities in the parking areas of the Development Property that do not violate the Zoning District Ordinance or other applicable law (whether commonly referred to as "tailgating" or otherwise).

(b)      Tenant shall have the right to sublease the Leased Premises (or any portion thereof) or grant licenses to use the Leased Premises (or any portion thereof) to third parties in furtherance of the purposes listed in Section 5.1(a) above.   Upon the request of Tenant, and to the extent not legally prohibited, Landlord from time to time shall provide a written certification to Tenant, a Subtenant or a Leasehold Mortgagee that a particular or contemplated use of the Leased Premises, or any portion thereof, is a permitted use under this Lease.   Tenant shall not be required, however, to obtain any prior consent from Landlord before engaging (or allowing any Subtenant to engage) in any particular use of the Leased Premises of a type described in Section 5.1(a) above.

(c)      Throughout the Term, Tenant shall cause adequate surface or structured parking facilities to be provided for the Ballpark, whether on the Leased Premises, the BRE Land or other property in the vicinity of the Ballpark.   The term "adequate" as used in this subsection shall mean in compliance with the Zoning District Ordinance and the rules and regulations, if any, of the Commissioner and the League.   Upon the request of

-15-

Landlord, Tenant from time to time shall provide a written certification to Landlord that parking facilities for the Ballpark exist that satisfy this requirement, identifying such parking facilities by lot and block reference or other legally sufficient description. If independently verified by it, Landlord shall notify Tenant and any lender designated by Tenant of its concurrence in such representation.

Section 5.2    Compliance with Laws.  Tenant agrees not to use the Leased Premises or any building situated thereon for any use or purpose in violation of any valid and applicable law, regulation or ordinance of the United States, the State of Texas, the City, or other lawful authority having jurisdiction over the Leased Premises; provided, however, that, except to the extent Tenant has current actual knowledge of such violation and is not in good faith contesting same as herein provided, there shall be no violation by Tenant of this provision unless and until Landlord or the applicable governmental entity has notified Tenant in writing, specifying the alleged violation, and so long as Tenant shall, in good faith within a reasonable time after Tenant acquires actual knowledge thereof, by appropriate proceedings and with due diligence contest the alleged violation or the validity or applicability of the laws, regulations or ordinance as hereafter permitted, until there has been a final adjudication that the specified use is in violation of the law, regulation or ordinance specified in such written notice, and that such specified law, regulation or ordinance is valid and applicable to the Leased Premises, and until Tenant has had a reasonable time after such final adjudication to cure the specified violation. Landlord further agrees that, so long as neither Landlord nor any portion of the Leased Premises will be subjected to any liability, loss, penalty or forfeiture, Tenant may at its sole cost and expense in good faith contest the alleged violation or the validity, enforceability or applicability of any such law, regulation or ordinance.  To the extent not legally prohibited, Landlord shall use its best reasonable efforts to cause the City to reasonably cooperate with Tenant in order to attempt to structure any proposed law or ordinance in a manner that minimizes its effect on the use of the Leased Premises.

Section 5.3    Maintenance.

(a)    Subject to the rights of Tenant pursuant to Section 4.1 hereof, Tenant shall keep all permanent improvements or buildings that from time to time may be on the Leased Premises in a reasonably good state of repair. Tenant's obligations for maintenance as provided in the preceding sentence shall be satisfied by (i) requesting Landlord to apply upon request, (and Landlord will so apply), any excess amounts on deposit from the proceeds of the Admissions Surcharge to the payment of the expenses of such maintenance activities, and (ii) paying any additional amounts needed for such purposes from Tenant's private funds. Landlord's obligation to apply such funds as provided in clause (i), above, shall be satisfied by, and limited solely to, the payment of the excess amount, if any, of the Admissions Surcharge collected for the applicable calendar year, over the aggregate amount (not to exceed two million dollars ($2,000,000.00) for any calendar year) of the Admissions Surcharge applied to the payment of principal of and interest on the Incremental Funding for the applicable calendar year as provided by Section 2.2 hereof. The obligations of Landlord for the payment of such maintenance costs shall apply to the first maintenance expenses incurred for the applicable calendar year and shall be so applied until all of such excess amounts of the Admissions Surcharge, if any, have been expended. It is expressly understood and

agreed that Landlord shall have no personal or corporate liability for the payment of such maintenance costs, but such costs shall be satisfied solely from the proceeds of the Admissions Surcharge as provided in this Section.

(b)    In the event this Lease shall terminate without the exercise of the Option by Tenant pursuant to the terms of Article XIII hereof, Tenant shall deliver up the Leased Premises and all buildings and improvements then situated thereon in good condition, reasonable wear and tear, obsolescence, acts of God and loss by casualty excepted. With regard to casualties damaging the Ballpark, Tenant will, within twenty-four (24) months after the date of a casualty commence the work of repair, reconstruction or replacement of the damaged Improvements (or any other improvement deemed appropriate by Tenant, if in compliance with the requirements hereof), provided that Tenant's obligations in this regard shall be limited to the amount of insurance proceeds received by Tenant or any Leasehold Mortgagee in accordance with Section 6.5 hereof. Notwithstanding the foregoing sentence, if Tenant determines that the Ballpark Property or the Ballpark alone shall be damaged or destroyed to an extent greater than fifty percent (50%) of the then-replacement value thereof, or to an extent such that the Ballpark cannot economically and feasibly be used by Tenant, Tenant shall have the additional option, within sixty (60) days from the date of the determination of the extent of such damage or destruction, to (i) terminate this Lease by giving written notice of such termination to Landlord within such 60-day period and this Lease shall terminate as of the termination date specified in such notice to Landlord, which shall not be less than thirty (30) days after the date of such notice, or (ii) exercise the Option, otherwise subject to its terms, by giving Landlord written notice of Tenant's election to so exercise such Option within such 60-day period. Upon the exercise of the Option as contemplated in this Section, Tenant shall pay the Option Price, and shall meet all of the other conditions to the exercise of the Option as set forth in Article XIII hereof. Upon the termination of this Lease as provided in this Section, Tenant shall, in addition, pay all Rental and other sums payable by Tenant hereunder as justly apportioned to such date of termination and Tenant shall not be required to repair the damage, but all insurance proceeds available as a result of such damage shall be paid to Landlord and applied to the amounts necessary to pay or defease the Incremental Funding, with any surplus being paid to Tenant.

Section 5.4    Operational Standards for Tenant.  The Leased Premises shall be operated in a reasonable and sound businesslike manner. Tenant shall, subject to the terms and provisions hereof, have full control of the operation and management of the Leased Premises, including, without limitation, the Ballpark and other Improvements. Without limiting the generality of the foregoing, such control by Tenant shall include and extend to (i) the use of the Leased Premises, and the Ballpark and other Improvements from time to time located therein, for all purposes incident thereto, (ii) the charges to be made for and the terms of admittance to each of the Ballpark, or the leasing of commercial space including signage, for privileges for entertainment and amusement, and for parking, food, beverages and other concessions, (iii) employee relations and policies, (iv) all phases of promotion and publicity, (v) the right to use, grant access to and control the parking areas and parking structures from time to time located on or serving the Leased Premises, including the right to limit their use to persons attending baseball games and other public events at the Ballpark, tenants, officers, employees, agents, contractors, suppliers, service providers, shippers, and other business guests of the Leased Premises. Tenant shall have

-17-

the full right to grant licenses, concessions, use and occupancy agreements, subleases, management agreements, operating agreements and any and all other agreements of any nature relating to the Leased Premises or any component thereof (including portions of the Ballpark Property) on such terms as Tenant deems appropriate, for periods not extending beyond the Term. Tenant shall also have the full right to close or otherwise restrict access to streets and roads around the Ballpark on game days, under the supervision and direction of the Arlington Police Department. Notwithstanding anything to the contrary contained herein, it is understood and agreed, subject to the approval of the City, by Landlord and Tenant that the Leased Premises and the Ballpark shall be exempt from all sign ordinances of the City for signs and similar structures within the Ballpark. No public address systems, signs, posters, billboards or scoreboards within the Ballpark shall be used for political purposes, so long as this Lease is in effect. Tenant shall have the exclusive authority, control and right to select the name of the Ballpark, as well as the sponsor or sponsors for which the Ballpark (or portions thereof) will be named from time to time; but the name of the Ballpark must include the word "Arlington" in any event.

Section 5.5    Operating Revenues.  Subject to its subleases and other agreements with third parties (including license and concession agreements), Tenant shall have the full right to collect and own as Tenant's exclusive property all revenues, profits, royalties, payments of every kind and rentals derived from, produced within or associated with the Leased Premises or any component thereof, including without limitation all sublease and other occupancy or license fees, admission tickets, all parking fees, all revenues derived from the sale of merchandise, goods, services, programs, novelties and concessions, all sponsorship revenues and facility naming revenues, all radio, television, cablecast, pay television and any other broadcasting revenues of any type whatsoever, irrespective of method of transmission or whether derived from the sale of broadcasting rights, broadcast advertising or other sources of revenue relating to broadcasting of League games during the Term, and all advertising and signage revenues of any type whatsoever, including but not limited to revenues from the sale of advertising and signage on scoreboards and outfield walls in the Ballpark and all other places on the Leased Premises; except as may otherwise be provided in the documents governing the Incremental Funding.

Section 5.6    Major League Baseball Franchise.  Landlord and Tenant acknowledge and agree that TRBP, Landlord and the City have executed and delivered the New Franchise Agreement as required by the Plan Ordinance and that the same is in full force and effect in accordance with its terms.

Section 5.7    Access Rights of Emerald Diamond.  Emerald Diamond shall have a right of ingress and egress as reasonable and necessary across the Ballpark Property from the public roads, highways, pathways, sidewalks, alleys and other public throughways located on the boundary of the Ballpark Property to the Centerfield Office Building, for the use and benefit of Emerald Diamond as tenant under the Centerfield Office Building Lease, and its representatives, agents, contractors, invitees, tenants, subtenants and employees. Landlord and Tenant hereby agree to execute and deliver to Emerald Diamond or to file, in form and substance reasonably satisfactory to Emerald Diamond, such licenses and easement agreements, and such further assurances and instruments, and do such further acts, as Emerald Diamond may, from time to time, reasonably consider necessary, desirable or proper to create and preserve its rights of access granted hereunder and to carry out more effectively the purposes of this section, and

Emerald Diamond may cause such licenses, agreements and instruments to be recorded and filed, at such times and places as may be required or permitted by law to so create and preserve such rights of access. This section may be enforce by, and shall inure to the benefit of, Emerald Diamond and its successors-in-interest as tenant under the Centerfield Office Building Lease.

## ARTICLE VI

### Insurance and Indemnity

Section 6.1    Liability Insurance.    Tenant agrees, at its sole expense, to obtain and maintain public liability insurance at all times during the Term with responsible insurance companies, legally authorized to transact business in the State of Texas and maintaining an office or agency in either Dallas County or Tarrant County, Texas, with limits of at least $500,000 for one person and $1,000,000 for one accident for personal injury to or death of any person or persons and $100,000.00 property damages, protecting Landlord, the City and Tenant against any liability, damage, claim or demand in any way arising out of or connected with the condition or use of the Leased Premises. Such insurance coverage may be maintained by any combination of single policies and umbrella policies and may be obtained and maintained by a Subtenant with respect to that portion of the Leased Premises subleased to such Subtenant. During any construction or reconstruction of Improvements, Tenant shall cause the general contractors for each major phase of the work to obtain and maintain public liability insurance with limits of at least those amounts specified above, naming Landlord, the City and Tenant as additional insureds, and protecting against any liability, damage, claim or demand in any way arising out of or connected with the Leased Premises or such work.

Section 6.2    Casualty Insurance.    At all times during the Term, Tenant shall at its sole expense keep all buildings and structures included in the Ballpark insured against loss or damage by fire, with extended coverage (if obtainable), to include direct loss by fire, windstorm, hail, explosion (other than boiler explosion), riot, civil commotion, aircraft, vehicles and smoke, with responsible insurance companies legally authorized to transact business in the State of Texas and maintaining an office or agency in either Dallas County or Tarrant County, Texas. Such insurance shall be in an amount sufficient to prevent co-insurance, but may provide for less than full replacement cost coverage for the Ballpark and related facilities on the Ballpark Property.

Section 6.3    Policies.    All insurance policies required by this Article shall provide for at least thirty (30) days' written notice to Landlord before cancellation and copies of certificates of policies of insurance shall be delivered to Landlord and the form and substance thereof shall be subject to the reasonable approval of Landlord. Landlord agrees that such policies may provide for such deductibles or self-insured retention amounts as Tenant determines, in its sole discretion, to be commercially reasonable. If any blanket general insurance policy of Tenant complies with the terms of these provisions, the naming of Landlord and the City therein as additional named insureds shall be deemed compliance with the requirements for the insurance coverage provided in any such blanket policy. Each Party hereby waives all claims, rights of recovery and causes of action that such Party or any person or entity claiming by, through or under such Party by subrogation or otherwise may now or hereafter have against the other Party or any of the other Party's present and future subsidiaries, affiliates, partners, officers, directors, employees, direct or indirect stockholders, agents, other representatives, successors and assigns

-19-

for bodily injury (including death) to persons, or loss or damage to property of Tenant or Landlord, whether caused by the negligence or fault of the other Party or its partners, directors, officers, employees, agents or representatives or otherwise, to the extent that the injuries, losses or damages are covered by the proceeds of insurance policies maintained by either Party.

Section 6.4    Named Insureds; Adjustment of Losses.   At the request of Tenant at any time during the Term, any Leasehold Mortgagee may be named as an additional insured under any of such insurance policies required under Section 6.2 hereof, as its interest may appear. Any loss under any such insurance policy required under Section 6.2 hereof shall be made payable to the Insurance Trustee for the benefit of Landlord and Tenant, to the end that the Insurance Trustee shall be entitled to collect all money due under such insurance policies payable in the event of and by reason of the loss of or damage to any building or other improvement included in the Ballpark or loss of or damage to the Leased Premises, to be applied pursuant to Section 6.6 below.   Any accumulation of interest on the insurance proceeds collected by the Insurance Trustee shall be added to, and become a part of, the trust fund being held by the Insurance Trustee for the benefit of Landlord and Tenant.  The adjustment of losses with the insurer shall be made by the Insurance Trustee only after securing the approval of Landlord and Tenant.

Section 6.5    Application of Proceeds of Casualty Insurance.   All proceeds payable pursuant to the provisions of any policies of casualty insurance required to be carried under the terms hereof shall be applied for the following purposes:

(a)    All proceeds shall first be used, subject to any other terms and conditions contained in this Lease (including, without limitation, Section 5.3) as a fund for the restoration and repair of the portion of the Leased Premises, and of any and all Improvements and equipment included in the Ballpark Property, which have become destroyed or damaged for which such proceeds are payable; and

(b)    Any funds not disbursed pursuant to Section 6.6(a) above shall be applied, subject to the terms of any Leasehold Mortgage, as directed by Tenant.

Section 6.6    Indemnity.   Tenant agrees to indemnify Landlord and the City against, and to hold Landlord and the City harmless from, any and all liabilities, damages, claims or demands arising out of any accident or occurrence during the Term causing injury to any person or damage to any property in any way connected with the demolition or construction of, or any land excavation or other grading in connection with, the construction or reconstruction of the Improvements now or hereafter on the Leased Premises performed solely by or at the sole discretion of Tenant, or any of its agents, representatives or affiliates, or the other use, occupancy or operation of the Leased Premises, including the Ballpark and other Improvements, or any part thereof by Tenant or any of its affiliates, unless caused in whole or in part by the negligence of Landlord or any of its officers, agents, representatives, assigns or employees acting in their official capacity or within the scope of their employment.

-20-

## ARTICLE VII

### Assignment and Subletting

Section 7.1    Assignment.  Tenant shall have the right at any time, without the consent of Landlord, to sell or assign all of the leasehold estate created hereby in its entirety, and the rights of Tenant, or any successor, assignee or grantee of Tenant, may pass by operation of law. Upon any such assignment, the assignee shall execute and deliver to Landlord a written assumption, in form and substance satisfactory to Landlord in its reasonable judgment, of all of the obligations of Tenant pertaining to the Leased Premises under this Lease. Except as provided below, Tenant shall remain liable to Landlord for all liabilities or obligations of the tenant provided under this Lease pertaining to the Leased Premises, including but not limited to the obligations of Tenant set forth in Article III and Section 5.6 hereof, unless expressly released therefrom by Landlord. Notwithstanding the foregoing, Tenant shall be relieved from all liabilities or obligations under this Lease pertaining to the assigned portion of the Leased Premises if such assignment is made in connection with the sale or transfer by TRBP of its Franchise to an entity not affiliated with Tenant, provided the assignee expressly assumes Tenant's obligations under this Lease, and the new owner of the Franchise expressly assumes the obligations of the "Owner" as defined in and under the New Franchise Agreement.

Section 7.2    Subletting. Tenant shall have the right at any time, without the consent of Landlord but subject to the Incremental Funding Documents, to sublet or otherwise assign the rights of use to seats, luxury suites, concessions and any portion of the Ballpark and related facilities incident to the full use and provision thereof as Tenant shall desire, including, but not limited to, scoreboards, outfield walls, concourses, club areas, signs and billboards located within or associated with the Ballpark. Tenant shall also have the right at any time, without the consent of Landlord to sublet portions of the Leased Premises and Improvements from time to time located on the Leased Premises. The Ballpark as a whole may not be subleased, however, without Landlord's consent, which shall not be unreasonably withheld provided that the intended Subtenant is a successor owner of the Team.

Section 7.3    Nondisturbance Agreement.  Upon the written request of Tenant, Landlord will enter into an appropriate Nondisturbance Agreement with any Subtenant.    The Nondisturbance Agreement shall include such reasonable provisions as requested by the Subtenant, subject to the approval of Landlord (which approval shall not be unreasonably withheld, conditioned or delayed), but in any event shall (i) reaffirm Landlord's ownership of the Leased Premises, (ii) confirm (if true) that this Lease is in full force and effect without default by Tenant (or, if a default exists, specifying the default and the remedy required by Landlord), and (iii) provide, in substance, that, so long as the Subtenant complies with all of the terms of its sublease, Landlord, in the exercise of any of its rights or remedies under this Lease, shall not deprive the Subtenant of possession, or the right of possession, of the subleased property during the term of the sublease, or join the Subtenant as a party in any action or proceeding to enforce or terminate this Lease or obtain possession of the property leased in the sublease for any reason other than a material breach by the Subtenant of the terms of the sublease which would entitle Landlord to dispossess the Subtenant thereunder, provided that (a) such Nondisturbance Agreement shall not cover any period beyond the Term, and (b) simultaneously with the execution of the Nondisturbance Agreement, the Subtenant, at the request of Landlord, shall

-21-

agree in writing that, in the event of any termination of this Lease prior to the expiration of its Term, the Subtenant shall be deemed attorned to Landlord, and shall become a tenant of Landlord under its sublease, with all rental thereunder payable to Landlord from and after the date of such attornment.

Section 7.4    General Provisions.  Tenant shall, in connection with any assignment or sublease, provide notice to Landlord of the name, legal composition and address of any assignee or Subtenant.  In addition, Tenant shall provide Landlord with a description of the nature of the assignee's or Subtenant's business to be carried on in the Leased Premises. In no event, however, shall Tenant be required to provide Landlord with a copy of any assignment agreement or sublease.

Section 7.5    Rights to Use of Seats and Suites.  All rights, privileges, easements and appurtenances belonging to or in any way pertaining to the rights to use of the Seats and the Suites hereby are leased, demised and let by Landlord unto Tenant, and Tenant does hereby take and lease all such rights, privileges, easements and appurtenances from Landlord, upon and subject to the terms, conditions and agreements contained in this Lease.  The leasing of the rights to the use of the Seats and the Suites under this Section 7.5 to Tenant shall in no way alter, affect, impair or diminish any rights to the use of the Seats and the Suites granted by Landlord to any party pursuant to the Incremental Funding Documents; provided, however, it is expressly agreed by Landlord and Tenant, and the Incremental Funding Documents provide, that upon and after the expiration, termination, cancellation or other forfeiture of any or all rights to the use of the Seats or the Suites initially granted to third parties by Landlord under the Incremental Funding Documents, such rights are hereby leased by Landlord to Tenant otherwise subject to the terms, conditions and agreements contained in this Lease, such that Tenant shall have the exclusive rights, powers and authorities to grant such rights and shall be entitled to the benefits flowing therefrom.  It is expressly agreed and understood that all seats in the Ballpark other than the Seats, and all luxury suites in the Ballpark other than the Suites (if any), have been leased and demised, and by this Lease and hereby leased and demised, by Landlord to Tenant together with all rights, privileges, easements and appurtenances belonging to or in any way pertaining to the rights to the use thereof and Landlord has, and shall have, no rights, powers or authorities to control or exercise such rights, and Landlord shall not be entitled to the benefits flowing therefrom at any time.  Landlord and Tenant further agree that they shall honor and recognize the rights to the use of the Seats and the Suites as granted by Landlord to the holders of such rights pursuant to the Incremental Funding Documents and subject to the terms thereof, and that they shall honor and perform their respective obligations under this Lease as the same may be required in connection with the Incremental Funding Documents and the rights to the use of the Seats and the Suites granted thereunder.

## ARTICLE VIII

### Leasehold Mortgages

Section 8.1    Leasehold Mortgage Permitted.  Tenant shall from time to time and at any time have the right to grant one or more Leasehold Mortgages, and in such event, upon Tenant's written request to Landlord, Landlord will execute and deliver a reasonable estoppel certificate addressed to each Leasehold Mortgagee under such Leasehold Mortgage setting forth the

-22-

information described in Section 14.2 hereof, confirming the terms of this Article VIII, and providing Landlord's agreement to recognize the Leasehold Mortgagee or any purchaser of the Mortgaged Premises at foreclosure in the same manner as an assignee pursuant to Section 7.1 hereof. Landlord agrees to accept any amendments of this Lease which are requested by a Leasehold Mortgagee prior to the execution of its Leasehold Mortgage which are reasonably calculated to protect the Leasehold Mortgagee's interest in this Lease under its Leasehold Mortgage and do not, in the reasonable opinion of Landlord, materially diminish the rights of Landlord under this Lease. Notwithstanding the foregoing, no Leasehold Mortgagee shall by virtue thereof acquire any greater right in the Mortgaged Premises and in any building or improvements thereon than Tenant then had under this Lease, and provided further that any Leasehold Mortgage and the indebtedness secured thereby shall at all times be and remain inferior and subordinate to all of the conditions, covenants and obligations of this Lease and to all of the rights of Landlord hereunder. In no event shall Tenant have the right to encumber, subordinate or render inferior in any way Landlord's fee simple title and reversionary interest in and to the Leased Premises.

Section 8.2    Notices to Leasehold Mortgagees.    If at any time after execution and recordation of any Leasehold Mortgage in the Deed of Trust Records of Tarrant County, Texas, in accordance with the provisions of Section 8.1, the Leasehold Mortgagee shall notify Landlord in writing that the Leasehold Mortgage on the Mortgaged Premises has been given and executed by Tenant, and shall furnish Landlord at the same time with the address to which Leasehold Mortgagee desires copies of notices to be mailed, or designates some person or corporation as its agent and representative for the purpose of receiving copies of notices, Landlord hereby agrees that it will thereafter mail to the Leasehold Mortgagee and to the agent or representative so designated by the Leasehold Mortgagee, at the address so given, duplicate copies of any and all notices in writing which Landlord may from time to time give or serve upon Tenant under and pursuant to the terms and provisions of this Lease and any and all pleadings in suits filed by Landlord against Tenant, as applicable. No notice to Tenant shall be effective as to the Leasehold Mortgagee unless duplicate copies thereof are mailed to such Leasehold Mortgagee at the same time the notice is given or served upon Tenant.

Section 8.3    Leasehold Mortgagee's Right to Cure.    If Landlord shall ever be entitled to exercise a right hereunder to terminate this Lease after the giving of notice or the passage of time, as applicable, Landlord, subject to notification by a Leasehold Mortgagee pursuant to Section 8.2 above, shall deliver additional written notice to such Leasehold Mortgagee of Landlord's intention to so terminate this Lease and describing the existing defaults, and such Leasehold Mortgagee thereafter shall have thirty (30) days to cure the defaults described in such written notice. Notwithstanding the foregoing, but subject to the provisions of Section 9.2, in the event (i) such default is not capable of cure within such 30-day period, this Lease may not be terminated if Leasehold Mortgagee shall deliver to Landlord, within such 30-day period, written notice of Leasehold Mortgagee's intention to cure the specified defaults and shall commence and diligently pursue the cure of the specified defaults and such defaults by reason of such due diligence are cured within ninety (90) days of the date of such notice, or (ii) any Leasehold Mortgagee is not in actual possession of the Mortgaged Premises on the date of the additional notice given the Leasehold Mortgagee under this Section 8.3, and possession is necessary in order to cure any default, then the time within which such Leasehold Mortgagee may commence to cure such default shall be extended for a reasonable time not to exceed ninety (90) days until

-23-

such Leasehold Mortgagee can obtain actual possession. No purported termination of this Lease shall be effective until such written notice shall have been given to each Leasehold Mortgagee and such 30-day period, or additional time period as provided above, shall have expired without the described defaults having been cured. Each Leasehold Mortgagee may, at its option any time before the rights of Tenant under this Lease shall have been terminated, pay any of the Rental due hereunder, procure any insurance required hereunder, pay any installments due with respect to the Incremental Funding, make any repairs and improvements required hereunder, or do any other act or thing or make any other payment required of Tenant by the terms of this Lease or which may be necessary and appropriate to comply with the covenants and conditions of this Lease to prevent the termination of this Lease. All payments so made and all things so done and performed by any such Leasehold Mortgagee shall be as effective to prevent a forfeiture of the rights of Tenant hereunder as if performed by Tenant.

        Section 8.4    New Lease.    Notwithstanding anything to the contrary contained in this Lease or otherwise, in the event of termination of this Lease for any reason prior to the stated expiration date, Landlord shall promptly notify all Leasehold Mortgagees of such termination. If the Leasehold Mortgagee having the highest priority with respect to this Lease cures all defaults giving rise to such termination as provided below, Landlord shall enter into a new lease of the Mortgaged Premises with such Leasehold Mortgagee for the remainder of the Term, such new lease to be effective as of the date of termination of this Lease, at the Rental and other payments then payable under Article III hereof, and upon all of the same terms, conditions, covenants, agreements, provisions and limitations contained herein, subject to the following:

        (a)    The Leasehold Mortgagee entitled to the new lease shall make written request to Landlord for a new lease within sixty (60) days after receipt by the Leasehold Mortgagee of written notice from Landlord of the date of termination of this Lease; and

        (b)    At the time of the execution and delivery of the new lease, the Leasehold Mortgagee shall pay to Landlord all amounts specified in the notice of termination delivered by Landlord which would have been due hereunder except for such termination and which are currently due except for such termination, and shall promptly cure all other defaults giving rise to such termination (that are reasonably susceptible of being cured by the Leasehold Mortgagee). The provisions of this Section 8.4 shall survive the termination of this Lease and shall continue in full force and effect thereafter to the same extent as if this Section 8.4 was a separate and independent contract among Landlord, Tenant and any Leasehold Mortgagee.

        Section 8.5    Leasehold Mortgagee's Liability.    Unless a new lease shall have been executed pursuant to Section 8.4 above, no Leasehold Mortgagee shall be or become personally liable to Landlord as an assignee of this Lease, for the payment or performance of any obligation of Tenant unless and until it expressly assumes by written instrument the payment or performance of such obligation, and no assumption of liability shall be inferred from or result from foreclosure or other appropriate proceedings in the nature thereof or as the result of any other action or remedy provided for by any Leasehold Mortgage, or from a conveyance or assignment pursuant to which any purchaser at foreclosure shall acquire the rights and interests of Tenant under the terms of this Lease; provided, however, any such assignee or purchaser must timely and diligently perform all obligations of the tenant hereunder that accrue thereafter.

-24-

Section 8.6    No Modification or Surrender.   During such time as Tenant's leasehold estate is subject to a Leasehold Mortgage, this Lease may not be modified in any material respect or voluntarily surrendered without the prior written consent of the Leasehold Mortgagee, provided such consent is not unreasonably withheld.

## ARTICLE IX

### Default of Tenant

Section 9.1    Monetary Defaults by Tenant.   In the event of a failure on the part of Tenant to pay Rental and the continuation of such failure for ten (10) days after the date such Rental is due hereunder, then and in such event Landlord shall have the full right at Landlord's election to take any of the remedies set forth in Section 9.3 hereof; provided, however, Landlord may not terminate this Lease because of such failure until Tenant has been provided with written notice of such failure (which notice shall include in bold or otherwise conspicuous print and manner the statement that **"FAILURE OF TENANT TO CURE THE DESCRIBED MONETARY DEFAULT BY PAYMENT OF THE DELINQUENT AMOUNT TO LANDLORD WITHIN TEN (10) DAYS FOLLOWING TENANT'S RECEIPT OF THIS NOTICE MAY RESULT IN TERMINATION OF THE LEASE"** and Tenant's failure then continues for ten (10) days after Tenant's receipt of such notice.

Section 9.2    Non-monetary Defaults by Tenant.

(a)    In the event of any breach of any covenant of this Lease by Tenant other than the failure to pay Rental when due, then and in such event Landlord shall have the right to give to Tenant and to each Leasehold Mortgagee in accordance with the provisions of Section 8.2 hereof a written notice specifying such breach, and unless within thirty (30) days from and after the date such notice is so given Tenant or any Leasehold Mortgagee shall have commenced to remove or to cure such breach and shall be proceeding with reasonable diligence to completely remove or cure such breach (provided such breach must be cured within ninety (90) days after such notice), then Landlord shall have the full right at Landlord's election to take any of the remedies set forth in Section 9.4 hereof; provided, however, that if any Leasehold Mortgagee is not actually in possession of the Leased Premises at the time of such default, then the time within which such Leasehold Mortgagee may commence to cure such default shall be extended for a reasonable time not to exceed ninety (90) days.

(b)    It is further provided that the following shall be events of default of Tenant hereunder entitling Landlord without notice to exercise any of the remedies set forth in Section 9.4 hereof: (i) the making of any general assignment for the benefit of creditors by Tenant; (ii) the filing of a voluntary petition in bankruptcy or a voluntary petition for an arrangement or reorganization under the United States Federal Bankruptcy Act (or similar statute or law of any foreign jurisdiction) by Tenant; (iii) the appointment of a receiver or trustee for all or substantially all of Tenant's interest in the Leased Premises or its leasehold estate hereunder if not removed within sixty (60) days; (iv) a material breach by TRBP of its Franchise Obligations or its obligations under the New Franchise Agreement that continues beyond any applicable grace, notice or cure periods,

-25-

and (v) the entry of a final judgment, order or decree of a court of competent jurisdiction adjudicating Tenant to be bankrupt, and the expiration without appeal of the period, if any, allowed by applicable law in which to appeal therefrom.

Section 9.3    Cross-Defaults Under other Agreements.    It is expressly agreed and provided that the occurrence of any event that constitutes a default by the lessee under the Centerfield Office Building Lease, or by the lessee under the Development Property Lease, (if such default continues beyond the expiration of any applicable grace, notice or cure period) shall constitute an event of default of Tenant under this Lease entitling Landlord without notice to exercise any of the remedies set forth in Section 9.4 hereof.

Section 9.4    Remedies.    Upon Landlord becoming entitled to pursue Landlord's remedies against Tenant, as provided in Sections 9.1, 9.2 and 9.3, above, and subject to the additional rights of any Leasehold Mortgagee to cure existing defaults pursuant to Section 8.3 hereof, Landlord may declare Tenant in default under this Lease and enforce the performance of this Lease and pursue any remedy in any manner provided and permitted by applicable law or in equity, including specific performance or damages, and this Lease may be terminated at Landlord's discretion. Upon Landlord electing to terminate this Lease, this Lease shall cease and come to an end as if that were the day originally fixed herein for the expiration of the Term hereof, subject, however, to the provisions of Section 8.4 hereof. All amounts expended by Landlord to cure any default or to pursue remedies hereunder shall be paid by Tenant to Landlord upon demand and shall be in addition to the Rental and other payments otherwise payable hereunder. All remedies of Landlord under this Lease shall be cumulative, and the failure to assert any remedy, and any waiver of any event of default, shall not be deemed to be a waiver of such remedy or event of default at later dates.

Section 9.5    Dispute Resolution.

(a)    Settlement by Mutual Agreement.    In the event any dispute, controversy or claim between or among the parties hereto arises under this Lease or any right, duty or obligation arising herefrom or the relationship of the parties hereunder (a "Dispute or Controversy"), including, but not limited to, a Dispute or Controversy relating to the effectiveness, validity, interpretation, implementation, termination, cancellation or enforcement of this Lease, the parties shall first attempt in good faith to settle and resolve such Dispute or Controversy by mutual agreement in accordance with the terms of this Section 9.5. In the event a Dispute or Controversy arises, any party hereto shall have the right to notify the other party hereto that the notifying party has elected to implement the procedures set forth in this Section 9.5. Within fifteen (15) days after delivery of any such notice by one party to the other party regarding a Dispute or Controversy, a representative of each of the parties shall meet at a mutually agreed time and place to attempt, with diligence and good faith, to resolve and settle such Dispute or Controversy. Should a mutual resolution and settlement not be obtained within fifteen (15) days after the meeting of the parties' representatives for such purpose, or such longer period as the parties may mutually agree upon, then either party may by notice to the other party submit the Dispute or Controversy to arbitration in accordance with the provisions of Section 9.5(b) and Exhibit A hereto (the "Arbitration Procedures"). Upon the receipt of notice of referral to arbitration hereunder, the receiving party shall be compelled to

-26-

arbitrate the Dispute or Controversy in accordance with the terms of this Section 9.5 and Exhibit A hereto without regard to the justifiable character or executory nature of such Dispute or Controversy.

(b)     Arbitration.   Each party hereto hereby agrees that any Dispute or Controversy which is not resolved pursuant to the provisions of Section 9.5(a) above shall be submitted to binding arbitration hereunder and shall be resolved exclusively and finally through such binding arbitration in accordance with the Arbitration Procedures. This Section 9.5(b) and Exhibit A hereto are and hereby constitute a written agreement by the parties hereto to submit to arbitration any such Dispute or Controversy arising after the effective date of this Lease within the meaning of Section 171.001 of the Texas Civil Practice and Remedies Code.

(c)     Emergency Relief.   Notwithstanding any provision of this Lease to the contrary, any party hereto may seek injunctive relief or other form of ancillary relief at any time from any court of competent jurisdiction in Tarrant County, Texas. In the event that a Dispute or Controversy requires emergency relief before the matter may be resolved under the Arbitration Procedures, notwithstanding that any court of competent jurisdiction may enter an order providing for injunctive or other form of ancillary relief, the parties hereto expressly agree that the Arbitration Procedures will still govern the ultimate resolution of that portion of the Dispute or Controversy not resolved pursuant to said court order.

## ARTICLE X

### Default of Landlord

Section 10.1   Defaults.   In the event of any breach of any covenant of this Lease by Landlord, then and in such event Tenant shall have the right to execute and deliver to Landlord a written notice specifying such breach, and unless within thirty (30) days from and after the date of delivery of such notice Landlord shall have commenced to remove or to cure such breach and shall be proceeding with reasonable diligence to completely remove or cure such breach (provided such breach must be cured within ninety (90) days after such notice), then Tenant shall have the full right at Tenant's election to take any of the remedies set forth in Section 10.2 hereof. It is expressly agreed and provided that the occurrence of any event that constitutes a default by the landlord under the Centerfield Office Building Lease, or the Development Property Lease, (if such default continues beyond the expiration of any applicable grace, notice or cure period) shall constitute an event of default of Landlord under this Lease, entitling Tenant without notice to exercise any of the remedies set forth in Section 10.2 hereof.

Section 10.2   Remedies.   Upon Tenant becoming entitled to pursue Tenant's remedies against Landlord, as provided in Section 10.1 above, Tenant may enforce the performance of this Lease, terminate this Lease, or abate payment of any Rental due for so long as any default remains uncured (to the extent of any monetary damages incurred as set forth in this Lease), and pursue any remedy in any manner, or exercise any remedy, provided and permitted by applicable law, in equity or under this Lease. All remedies available to Tenant shall be cumulative and Tenant's exercise of a single remedy shall not later preclude Tenant from exercising any other

-27-

available remedy (including, but not limited to, the right of specific performance, damages or mandamus). Notwithstanding anything to the contrary contained herein, any monetary damages for which Landlord shall be liable hereunder shall be satisfied solely as a credit against, and all sums expended by Tenant to cure any defaults of Landlord shall be applied solely as a credit to, each of (i) the Rental due under this Lease in order of the next maturing installments, and (ii) the Option Price.

## ARTICLE XI

### Condemnation

Section 11.1   Definitions.   Whenever used in this Article, the following words shall have the definitions and meanings herein set forth:

(a)   "Condemnation Proceedings": Any action brought for the purpose of any taking of the Leased Premises, the Ballpark or other Improvements or any part thereof or any other property interest therein by competent authority as a result of the exercise of the power of eminent domain, including a voluntary sale to such authority either under threat of condemnation or while such action or proceeding is pending.

(b)   "Taking" or "Taken": The event and date of vesting of title to the Leased Premises, the Ballpark or other Improvements or any part thereof or any other property interest therein pursuant to the condemnation proceedings.

Section 11.2   Efforts to Prevent Taking.   Landlord agrees to use its reasonable efforts to cause the City and all other competent authorities with the power of eminent domain to refrain from instituting any Condemnation Proceedings or exercising any other powers of eminent domain with respect to the Leased Premises, the Ballpark or other Improvements or any part thereof or any interest therein during the Term.

Section 11.3   Entire Taking.   If all the Leased Premises, Ballpark, and Improvements shall be taken in Condemnation Proceedings, this Lease shall terminate as of the Taking and the Rental shall be paid to the date of such termination; provided, however such termination shall not affect Tenant's rights to recovery of any portion of an award for its leasehold interests hereunder or other interests, as otherwise provided herein. Landlord shall give Tenant a proportionate refund of any Rental paid for periods after the date of such termination.

Section 11.4   Partial Taking.

(a)   If less than all the Leased Premises and the Ballpark and Improvements shall be taken in Condemnation Proceedings, Tenant shall determine, within a reasonable time after such Taking, whether the remaining Leased Premises, Ballpark or Improvements, or the Ballpark (after necessary and feasible repairs and reconstruction to constitute the same a complete architectural unit or units), can economically and feasibly be used by Tenant.

(b)   If it is determined by Tenant that such remaining Leased Premises, Ballpark or Improvements cannot economically and feasibly be used by Tenant, or that

-28-

the Ballpark cannot economically and feasibly be used by Tenant, then Tenant, at its election and written consent of any Leasehold Mortgagee, if any, may terminate this Lease on thirty (30) days' notice to Landlord to such effect; provided, however, such termination shall not affect Tenant's rights to recovery of any portion of an award for its leasehold interests hereunder or other interests, as provided herein. However, such election to terminate must be exercised within sixty (60) days after the determination that the remaining Leased Premises, Ballpark or Improvements, or the Ballpark, cannot economically and feasibly be used by Tenant. Landlord shall give Tenant a proportionate refund of any Rental paid for periods after the date of such termination.

Section 11.5   Condemnation Award.

(a)   Upon any Takings, Landlord and Tenant shall each be entitled to receive and retain such separate awards or portions of lump sum awards as may be allocated to their respective interests in any Condemnation Proceedings, subject to the following:

(i)   If a partial Taking occurs and Tenant is required or determines to repair or reconstruct the remaining Ballpark and Improvements, Tenant shall be entitled to an amount equal to the costs of such repair or reconstruction to be so applied; and

(ii)   Landlord shall be entitled to an amount equal to the value of the portion of Leased Premises taken considered as unimproved, raw land, valued as a separate parcel not part of a larger assemblage of land and valued on the basis of such parcel's then highest and best use, but encumbered by this Lease (i.e., the value of the remainder interest of Landlord), which amount also shall be applied as a credit against the Option Price; and

(iii)   Landlord shall be entitled to an amount equal to the then current fair market value of the portion of the Ballpark owned by Landlord and situated on the portion of the land taken in its condition existing at the time of Taking, which amount also shall be applied as a credit against the Option Price; and

(iv)   The balance of the award, including without limitation an amount equal to the current rent fair market value of the portion of the Improvements owned by or paid for by Tenant situated on the portion of the land taken in their condition existing at the time of Taking and all moving expenses and diminishment in value of other property of Tenant, shall be paid to Tenant, subject to the rights of any Leasehold Mortgagees.

(b)   If this Lease is not terminated by Tenant pursuant to the provisions of Section 11.4(b) after a partial condemnation, then (i) this Lease shall not terminate and it shall continue in full force and effect as to the portion of the Leased Premises not taken, and the Rental payable hereunder shall be equitably reduced during the unexpired portion of the Term, and (ii) Tenant shall commence and proceed with reasonable diligence to repair or reconstruct the remaining Improvements on the Leased Premises to a complete architectural unit or units; provided, however, Tenant's obligation to so repair or

-29-

reconstruct the remaining Improvements shall be limited to the proceeds of the condemnation award actually received by Tenant under this Section.

(c)      In addition, the Rental payable hereunder shall be equitably reduced during the unexpired portion of the Term upon a partial condemnation of the premises leased under the Centerfield Office Building Lease or Development Property Lease, where such lease is not terminated by the tenant thereunder but remains in effect as to the portion of such premises not so taken; provided the tenant thereunder repairs or reconstructs the remaining improvements on such premises to a complete architectural unit or units to the extent required therein and limited thereby.

Section 11.6   Temporary Taking.  If any right of temporary (herein defined) possession or occupancy of all or any portion, of the Leased Premises shall be taken, the foregoing provisions of this Article shall be inapplicable thereto and this Lease shall continue in full force and effect without reduction or suspension of Rental or other amounts and Tenant shall be entitled to make claim for and recover any award or awards, whether in the form of Rental or otherwise, recoverable in respect of such possession or occupancy, and Landlord shall have no right or claim to any such award or awards. For the purposes of this Section 11.6, the Taking of possession or occupancy shall be regarded as "temporary" if it does not extend beyond the Term. Any Taking of the right of possession or occupancy of all or any portion of the Leased Premises, which is for a period that does extend beyond the Term, shall be regarded for purposes of this Lease as a Taking which is not temporary and to which the foregoing provisions of this Article XI shall be applicable.

Section 11.7   Settlement of Proceedings.  Landlord shall not make any settlement with the condemning authority in any Condemnation Proceedings nor convey or agree to convey the whole or any portion of the Leased Premises, the Ballpark or any other Improvements to such authority in lieu of condemnation without first obtaining the written consent of Tenant and any Leasehold Mortgagee.

Section 11.8   Exercise of Option.  Notwithstanding anything to the contrary contained herein, upon the institution of any Condemnation Proceedings which may result in an entire Taking of the Ballpark Property, Tenant shall be entitled to exercise the Option with respect to the Centerfield Office Building and the Development Property that is owned by Landlord at that time, by giving Landlord written notice of Tenant's election to so exercise the Option within sixty (60) days after the date on which Tenant is served with the official summons of the Condemnation Proceedings. Upon the institution of any Condemnation Proceedings which may result in a partial Taking of the Ballpark Property as a result of which Tenant determines that the remaining portion of the Ballpark Property, or the Ballpark alone, cannot economically and feasibly be used by Tenant, or its assignee or Subtenants, Tenant shall be entitled to exercise the Option with respect to such remaining portion of the Ballpark Property, the Centerfield Office Building, and the Development Property that is owned by Landlord at that time, by giving Landlord written notice of Tenant's election to so exercise the Option within sixty (60) days after the determination by Tenant that such remainder, or the Ballpark alone, cannot economically and feasibly be used by Tenant, or its assignee or Subtenants.

-30-

## ARTICLE XII

### Representations, Warranties and Special Covenants

Section 12.1   Landlord's Representations, Warranties and Special Covenants.   Landlord hereby represents, warrants and covenants as follows:

(a)   Corporate Existence.   Landlord is a public corporation duly organized under the provisions of the Act, validly existing and in good standing under the laws of the State of Texas and its adopted and currently effective articles of incorporation. Landlord shall not cause and, subject to the statutory rights of the City, shall take all necessary or appropriate action to prevent any amendments to its articles of incorporation, bylaws or other organizational documents, or the dissolution of Landlord or the reorganization of Landlord in any organizational form other than the form in which Landlord exists as of the execution date of this Lease for so long as this Lease is in effect, without the prior written consent of Tenant in each instance, which consent shall not be unreasonably withheld.   Landlord shall take, and use its reasonable best efforts to cause the City to take, all necessary or appropriate action to avail Landlord of the rights, powers and benefits of the Act, subject to the terms of this Lease.

(b)   Authority.   Landlord has all requisite power and authority to own its property and the Leased Premises, operate its business, enter into this Lease and consummate the transactions herein contemplated, and by proper action in accordance with all applicable law has duly authorized the execution and delivery of this Lease and the consummation of the transactions herein contemplated.

(c)   Binding Obligation.   This Lease is a valid obligation of Landlord and is binding upon Landlord in accordance with its terms.

(d)   No Defaults.   The execution by Landlord of this Lease and the consummation by Landlord of the transactions contemplated hereby do not, as of the Commencement Date, result in a breach of any of the terms or provisions of, or constitute a default or a condition which upon notice or lapse of time or both would ripen into a default under the Act, the articles of incorporation or bylaws of Landlord, or under any resolution, indenture, agreement, instrument or obligation to which Landlord is a party or by which the Leased Premises or any portion thereof is bound; and does not to the knowledge of Landlord, constitute a violation of any order, rule or regulation applicable to Landlord or any portion of the Leased Premises of any court or of any federal or state or municipal regulatory body or administrative agency or other governmental body having jurisdiction over Landlord or any portion of the Leased Premises.

(e)   Consents.   No permission, approval or consent by third parties or any other governmental authorities is required in order for Landlord to enter into this Lease, or make the agreements herein contained, other than those which have been obtained.

(f)   Mineral Drilling Activities, Quiet Enjoyment.   The Landlord agrees and guarantees that, during the Term, (i) it will not undertake or engage in any mineral

-31-

drilling or discovery and recovery activities under or with respect to the Leased Premises that would intrude upon or disrupt any portion of the surface of any part or portion of the Leased Premises, and that (ii) Tenant shall have the quiet enjoyment and peaceable possession of the Leased Premises against hindrance or disturbance of any person or persons whatsoever.

(g)   Uses of Mineral Income and Revenues.   The Landlord hereby promises and agrees that any and all revenues of any nature or kind that its receives from the mining, drilling, discovery, and recovery of any oil, gas, and/or other minerals under or with respect to the Leased Premises shall be paid annually to the City and shall be used by the City to pay the costs of dredging, cleaning, and maintaining Johnson Creek, including the channel, its banks, and retaining walls, and the lakes that are a part of Johnson Creek and that are adjacent to the Ballpark.

(h)   Proceedings.   There are no actions, suits or proceedings pending or, to the reasonable best knowledge of Landlord, threatened or asserted against Landlord affecting Landlord or any portion of the Leased Premises, at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

(i)   Impositions.   Landlord has not received any notice of any condemnation actions, special assessments or increases in the assessed valuation of taxable property or other Impositions of any nature which are pending or being contemplated with respect to the Leased Premises, or any portion thereof.

(j)   Compliance with Laws.   Landlord has not received any notice of any violation of any ordinance, regulation, law or statute of any governmental agency pertaining to the Leased Premises or any portion thereof.

(k)   Title and Encumbrances.   Landlord holds good and indefeasible fee simple title to the Leased Premises.  Except as expressly referred to herein, there are no liens or security interests against the Leased Premises, nor are there any liens or actions pending, to the knowledge of Landlord, which would result in the creation of any lien, for any existing improvements, including, but not limited to, water, sewage, street paving, electrical or power improvements, which give rise to any lien, completed or in progress, and there are no unpaid bills or claims in connection with any repair of the existing improvements or other work performed or material purchased in connection with the existing improvements and no part of the existing improvements have been destroyed or damaged by fire or other casualty.

(l)   Notices.   Landlord shall concurrently furnish Tenant with copies of all notices given by Landlord to, or received by Landlord from, any party to a "Credit Agreement" under and as defined in any supplemental resolution passed by Landlord in connection with the Incremental Funding (all of such resolutions collectively are called the "Resolutions" herein).  Landlord shall timely furnish Tenant with notice of Landlord's intention to remove any fiduciary entity under any of the Resolutions and consult with Tenant prior to the selection and appointment of any successor thereto.

-32-

Landlord shall timely furnish Tenant with notices of all meetings of the board of directors of Landlord and Tenant shall be entitled to inspect all books and records of Landlord to the same extent permitted by any party under any of the Resolutions or any such Credit Agreement.

(m)     Limitations. Except as otherwise expressly provided herein, this Lease is made by Landlord without representation or warranty of any kind, either express or implied, as to the condition of the Leased Premises, its merchantability, its condition or its fitness for Tenant's intended use or for any particular propose and all of the Leased Premises is leased on an "as is" basis with all faults. Landlord does not warrant or represent that the Ballpark are or at any time will be habitable for any purpose or use.

Section 12.2   Tenant's Representations, Warranties and Special Covenants.

(a)     Existence. Tenant is a limited partnership duly organized under the laws of the State of Texas, validly existing and in good standing under the laws of the State of Texas and its adopted and currently effective certificate of limited partnership.

(b)     Authority. Tenant has all requisite power and authority to own its property, operate its business, enter into this Lease and consummate the transactions herein contemplated, and by proper action has duly authorized the execution and delivery of this Lease and the consummation of the transactions herein contemplated.

(c)     Binding Obligations. This Lease is a valid obligation of Tenant and is binding upon Tenant in accordance with its terms.

(d)     No Default. The execution by Tenant of this Lease and the consummation by Tenant of the transactions contemplated hereby do not, as of the execution date, result in a breach of any of the terms or provisions of, or constitute a default or condition which upon notice or lapse of time or both would ripen into default under the certificate of limited partnership or partnership agreement of Tenant, or under any indenture, agreement, instrument or obligation to which Tenant is a party or is bound.

(e)     Consents. No other permission, approval or consent by third parties or any other governmental authorities is required in order for Tenant to enter into this Lease or consummate the transactions herein contemplated, other than those which have been obtained.

(f)     Leasehold Mortgages. Tenant has entered into a Leasehold Mortgage of Tenant's interests under this Lease as of the Commencement Date.

-33-

## ARTICLE XIII

### Option To Purchase Property

Section 13.1    Grant of Option.

(a)    Landlord hereby grants to Tenant for the period and at the price and on the terms and conditions herein set forth, the exclusive and irrevocable option (the "Option") to purchase as a single unit all at one time, and not less than all at one time, of (i) the Ballpark Property and all Improvements thereon, (ii) the Centerfield Office Building, and (iii) such of the Development Property that is owned by Landlord at the time of the exercise of the Option, together with all easements, interests, rights, benefits, and privileges, if any, benefiting the property described in clauses (i), (ii), and (iii), above, that are owned by Landlord at the time of purchase and all rights and appurtenances pertaining to such property or easements, including, but not limited (1) to any and all right, title, or interest of Landlord in and to the adjacent streets, roads, alleys, or rights-of-way, together with all rights of ingress and egress onto and from such property and strips and gores, if any, between such property and abutting properties, save and except 100% of any and all oil, gas and minerals lying under, in, on or about, or constituting part of, such property, regardless of whether such minerals are considered a part of the surface estate or a part of the mineral estate, the same being hereby reserved to the Landlord and the City, and (2) all right, title and interest of Landlord in and to all furniture, equipment, fixtures, appliances, and other property of whatsoever nature, situated on or in such property or used in connection therewith and to the extent assignable, all warranties and guarantees, if any, with respect to any portion thereof.  All of the above items that are herein referred to as the "Purchase Property."

(b)    Tenant, and the lessee under the Centerfield Office Building Lease, and the lessee under the Development Property Lease, are authorized to enter into agreements among each other allocating and managing the rights of the holder of the Option in such manner as they may deem appropriate, subject to the conditions to the exercise thereof as stated in this Article XIII and elsewhere in this Lease.

(c)    The exercise of the Option during the Option Period is expressly conditioned upon (i) the prior or concurrent payment in full by Tenant of all amounts due and owing under the Dispute Settlement Agreement, and (ii) the receipt by the City of an acknowledgement and agreement by the Owner of the Team (A) to extend its obligations under the New Franchise Agreement until April 11, 2034, and (B) that the Owner of the Team is bound to operate the Ballpark Property in such manner that will permit the Owner of the Team to perform its obligations under clause (ii)(A), above.

(d)    If the Option is exercised, the Option Price (the "Option Price") shall be the difference between $60,000,000 and the aggregate amount of credits earned by Tenant under the Option Contract prior to the Commencement Date. The Option Price shall be payable as set forth in Section 13.1(e) below.

(e)     Subject to subsection (g) of this Section, below, the Option may be exercised only (i) during, and not before, the twelve (12) calendar month period following April 11, 2024, (ii) when permitted by subsection 5.3(b) of Section 5.3 hereof, and (iii) when permitted by Section 11.8 hereof (in each such case, an "Option Period"), and only if (A) no Event of Default, as defined in Article IX of this Lease, has occurred and is then continuing, and (B) in the case of Tenant's exercise of the Option in accordance with clause (i) above, Tenant executes a document reasonably acceptable to Landlord acknowledging and reconfirming its obligations under the New Franchise Agreement. During the Option Period, and subject to those conditions, Tenant shall have the right to exercise the Option at any time by delivering written notice of such election (the "Option Exercise Notice") to Landlord.

(f)     Notwithstanding anything herein to the contrary, Tenant shall also have the right, but not the obligation, to exercise the Option in the circumstances described in Sections 5.3(b) and 11.8 above. In such event, (i) all sums expended or costs incurred after the Commencement Date by Tenant (or any affiliate of Tenant) for the maintenance, clean-up and other lease-related expenses of the Ballpark, the Centerfield Office Building, and the Development Property from time to time subject to the Development Property Lease, up to but not exceeding $1,500,000 for each Lease Year or pro rata portion thereof for any partial Lease Year prior to the Closing of the Option, and (ii) the aggregate amount of all sums (A) expended by Tenant after the Commencement Date for (1) Impositions pursuant to Section 3.4(d) hereof, and (2) the cure of any defaults first occurring after the Commencement Date of Landlord pursuant to Section 10.2 hereof; and (B) received by Landlord after the Commencement Date in the event of a Taking of the Purchase Property or a portion thereof pursuant to Section 11.5 hereof, shall be credited against the Option Price.

(g)     The Option Price shall be paid to Landlord by Tenant in cash or other immediately available funds at Closing; provided that the aggregate amount of all Rental paid after the Commencement Date pursuant to this Lease shall be credited to the Option Price (together with the credit amounts described in Section 13.1(d), in the case of an early exercise of the Option). Should the credits against the Option Price at any time during the term of this Lease exceed the amount of the Option Price, Tenant, nevertheless, and unconditionally remains obligated and bound to pay to Landlord all Rental under this Lease during the Term.

(h)     Tenant hereby acknowledges and agrees that (i) the tenant under the Development Property Lease has the right and option under the Development Option Agreement to request that the landlord under the Development Property Lease transfer title to all or any portion of the Development Property to or as directed by such tenant, and (ii) the Option herein granted to Tenant shall not apply to any land the title to which shall have been transferred under the Development Option Agreement before delivery by Tenant to Landlord of the Option Exercise Notice.

Section 13.2   Documents Provided to Tenant.  The date that the Option Exercise Notice is given is each referred to herein as an "Exercise Date." Landlord hereby covenants and agrees with Tenant to deliver to Tenant within thirty (30) days after an Exercise Date, copies of any and

-35-

all instruments relating to or affecting the Purchase Property, and any and all instruments securing payment of the same which are not in the possession of Tenant.

Section 13.3   Tenant's Right to Extend or Disapprove.   If Landlord fails to supply true, correct and complete copies of all documents required by Section 13.2 herein, within such thirty (30) day period, Tenant may either (a) extend the time for which Landlord is to furnish such documents; or (b) revoke its exercise of the Option, without liability.  If Tenant elects to extend the time for delivery of any such document, Tenant may exercise the election mentioned in the preceding sentence if Landlord fails to provide any such document within the time permitted by such extension.  Within fifteen (15) days after the date Landlord has furnished Tenant all documents and information required in Section 13.2 herein, Tenant may, by notice to Landlord, disapprove of any of such documents to which Tenant has not previously expressly consented, and in such event, Landlord shall use its best efforts to correct any matter objected to by Tenant.  If Landlord fails to correct any such matter objected to, Tenant may revoke its exercise of the Option without owing any liability to Landlord.

Section 13.4   Survey.   Within fifteen (15) days after the Exercise Date, Landlord shall, at Tenant's expense, obtain and furnish to Tenant and a title company approved by Tenant ("Title Company"), a staked-on-the-ground survey satisfactory to Tenant certified by an independent licensed surveyor of the real property components of the Purchase Property (herein the "Survey") which shall be satisfactory to Tenant and the Title Company and sufficient to the Title Company to issue to Tenant the Title Policy (as herein defined) with the standard printed exception for survey matters amended to read only "shortages in area." The Survey may be an updated and recertified survey of the real property components of the Purchase Property satisfactory to Tenant. The Survey shall include, without limitation: (a) the legal description of such real property, and all appurtenant easements; (b) the exact location and (by courses and distances) the exact dimensions of such real property and surface and subsurface structures and improvements on such real property and all easements, appurtenances and other like items, if any, relating thereto; (c) the exact location and identity of all lot lines and contiguous streets and curbs as well as measurements to the nearest intersection or other adequate checkpoint, all means of access to such real property and all utility wires, pipes and other conduits or easements or vaults relating to such real property; (d) no encroachments by any structures or improvements onto adjoining property or onto such real property or onto any easements as the case may be (except such encroachments as shall be approved or have been expressly approved by Tenant); and (e) no other state of facts that would render title to such real property in Tenant's opinion objectionable.  Within fifteen (15) days after the receipt of the last of the Survey, the Title Commitment (as herein defined), and true and accurate copies of all attendant documents thereto, Tenant shall have the right to disapprove of such Survey in form or substance and to revoke its exercise of the Option.

Section 13.5   Title Commitment.   Within fifteen (15) days after the Exercise Date, Landlord shall, at Tenant's expense, obtain and furnish to Tenant a current commitment for title insurance ("Title Commitment") issued by the Title Company showing the status of title to the real property components of the Purchase Property and all exceptions, including liens, easements, restrictions, rights-of-way, covenants, reservations, and other conditions, if any, affecting such real property that would appear in an owner's policy of title insurance (the "Title

-36-

Policy"), if issued, together with accurate copies of same, and committing to issue at the Closing such Title Policy to Tenant in the full amount of the Option Price.

Section 13.6   Title Exceptions. If the Survey or the Title Commitment show exceptions to title or matters affecting the real property components of the Purchase Property which are objectionable to Tenant (other than those expressly consented to or waived by Tenant in writing and the standard printed exceptions, which shall be modified in the Title Policy as specified in Section 13.10(b) hereof), Tenant shall, within fifteen (15) days after its receipt of the last of the Survey, the Title Commitment, and true and accurate copies of all documents attendance thereto, deliver to Landlord written objections thereto. Landlord shall have fifteen (15) days after the date of delivery by Tenant to Landlord of such objections to cure such defects and to present a revised Survey and a revised Title Commitment on the basis of which the Closing may occur as provided herein, and the Closing shall be extended to such extent as may be necessary for Landlord to cure such defects (but not more than fifteen (15) days unless Tenant agrees otherwise). Landlord shall use its best efforts and all due diligence to cure such defects. If such defects have not been cured within such fifteen (15) day period, Tenant may revoke its exercise of the Option or Tenant may extend the time for Landlord to cure such defects. All title exceptions at any time expressly consented to or waived in writing by Tenant, together with the standard printed exceptions to the Title Policy as modified as specified in Section 13.10(b), shall constitute the "Permitted Encumbrances."

Section 13.7   Title Representations and Warranties by Landlord. Landlord represents, warrants and covenants to Tenant now and at the time of Closing as follows:

(a)   Landlord shall have the right and power to convey good and indefeasible fee simple title to Tenant of the Purchase Property, free and clear of all encumbrances other than the Permitted Encumbrances.

(b)   Prior to the Closing, Landlord shall not create or permit to be created any easements or other conditions affecting any portion of the Purchase Property without the prior written consent of Tenant.

(c)   Except as otherwise expressly provided herein, the sale of the Purchase Property by Landlord to Tenant hereunder is without representation or warranty of any kind, either express or implied, as to the condition of the Purchase Property, its merchantability, its condition or fitness for Tenant's intended use or for any particular purpose and all the Purchase Property conveyed to Tenant pursuant to this Lease, if closed, shall be transferred, sold and conveyed on an "as is" basis with all faults.

(d)   Tenant may and has relied on the representations, warranties and covenants of Landlord contained in this Lease, each being a material inducement to Tenant to enter into this Lease and to close its purchase of the Purchase Property.

All the representations, warranties, covenants of Landlord contained herein shall survive the Closing.

Section 13.8   Closing Date. The closing of the sale of the Purchase Property by Landlord to Tenant (the "Closing") shall be at the Title Company on the sixtieth (60th) day after

-37-

the date Tenant delivers the Exercise Notice to Landlord, or if Landlord has not performed all of its obligations contained herein or if Tenant has extended any time periods for such performance, on such date as may be directed by Tenant no later than thirty (30) days after Landlord has performed all of its obligations contained herein (the "Closing Date"). Tenant shall not be obligated to close its purchase of the Purchase Property unless Landlord timely performs each and all of its obligations hereunder, provided Tenant may at any time waive performance of any one or more of Landlord's obligation and close such purchase.

Section 13.9    Tenant's Obligation at Closing.    At the Closing, Tenant shall deliver to Landlord a cashier's, certified or title company check payable to Landlord's order in the amount of (i) the Option Price, subject to all credits provided in Article XIII hereof, and (ii) such documents or information as Landlord or the Title Company may reasonably require in order to consummate the purchase and sale transaction contemplated by this Article XIII.

Section 13.10    Landlord's Obligation at Closing.    At Closing, Landlord, at sole cost and expense of Tenant, shall deliver or cause to be delivered to Tenant the following:

(a)    A Special Warranty Deed (the "Deed"), in form and substance satisfactory to Tenant, fully executed and acknowledged by Landlord, conveying to Tenant the Purchase Property, subject only to the Permitted Encumbrances.

(b)    The Title Policy, issued by the Title Company, in the full amount of the Option Price showing Tenant as owner of the real property components of the Purchase Property and insuring Tenant's good and indefeasible fee simple title to such real property, subject only to the Permitted Encumbrances, however, that (i) the exception as to restrictive covenants shall be deleted, or any existing restrictive covenants constituting Permitted Encumbrances shall be specifically listed, (ii) the survey exception shall be limited to shortages in area, and (iii) the exception as to liens for assessments and taxes shall be limited to the year of Closing and Landlord shall furnish Tenant with tax certificates reflecting no assessments or taxes being currently due and payable against the Purchase Property.

(c)    A special warranty Bill of Sale in form and substance acceptable to Tenant conveying to Tenant all remaining portions of the Purchase Property not conveyed to Tenant by the Deed.

(d)    Evidence satisfactory to Tenant and the Title Company that Landlord and its representatives have the authority to convey, assign and transfer the Purchase Property.

(e)    Exclusive possession of all the Purchase Property, subject only to the Permitted Encumbrances.

(f)    Such other documents or information as Tenant or the Title Company reasonably require in order to consummate the transactions contemplated hereby.

Section 13.11    Closing Costs.    Except as otherwise provided in this Article XIII, all closing costs shall be paid by Tenant, provided that each party shall pay its own legal expenses.

-38-

Section 13.12 <u>Condemnation</u>. If any damage by fire or other casualty occurs to the Purchase Property after an Exercise Date but before the Closing Date, or if any proceeding or threat of proceeding in condemnation or eminent domain is initiated against the Purchase Property after the Exercise Date but before the Closing Date, such casualty loss or condemnation shall be governed by the other terms of this Lease; provided that Landlord shall give immediate notice thereof to Tenant and Tenant shall have the right to revoke its exercise of the Option without liability or further obligation.

Section 13.13 <u>Revocation by Tenant</u>. In addition to the rights of revocation herein granted upon the occurrence of specified events, Tenant shall have a general right to revoke its exercise of the Option pursuant to this Article XIII at any time prior to the Closing, without cause, by giving written notice of revocation to Landlord. If Tenant's exercise of the Option is revoked pursuant to a right herein granted, the Option shall be automatically reinstated and Tenant may again exercise the Option at a later date, but only during the unelapsed portion of the Option Period in accordance with this Article XIII.

Section 13.14 <u>Landlord's Default</u>. If Landlord defaults in timely and strictly performing any of Landlord's obligations under the terms of this Article XIII for any reason, other than Tenant's default, Tenant may revoke its exercise of the Option or enforce specific performance of this Article XIII.

Section 13.15 <u>Tenant's Default</u>. If Tenant has not revoked its exercise of the Option pursuant to a right herein granted, and fails to pay the Option Price (subject to applicable credits) as and when due at the Closing, the Option shall automatically terminate, and Landlord and Tenant shall have no further obligation or liability to each other under this Lease.

Section 13.16 <u>No Assumption Of Liabilities</u>. Tenant is not and shall not be deemed to be a successor of Landlord, it being understood that, if the transaction contemplated by this Article XIII is closed, at the Closing Tenant will acquire the Purchase Property only, pursuant to the terms of this Article XIII, and it is expressly understood and agreed that Tenant, has not and does not hereby assume or agree to assume any liability whatsoever of Landlord, nor does Tenant assume or agree to assume any obligation of Landlord under any contract, agreement, indenture or any other document to which Landlord is a party or by which Landlord is or may be bound or that in any manner affects the Purchase Property or any part thereof; except as may be provided in the Permitted Encumbrances or otherwise expressly agreed to by Tenant in writing.

Section 13.17 <u>Scope of Option</u>. For purposes of this Article XIII, the term "Landlord" shall mean the Authority with respect to the Ballpark Property and all Improvements thereon, and the Centerfield Office Building, and shall mean the City with respect to such of the Development Property that is owned by the City at the time of the exercise of the Option.

**ARTICLE XIV**

**Miscellaneous**

Section 14.1    <u>Inspection</u>. Tenant shall permit Landlord and its agents, upon no less than twenty-four (24) hours' prior notice, to enter into and upon the Leased Premises during normal

-39-

business hours on days upon which no sports, entertainment or other public event is scheduled at the Ballpark, for the purpose of inspecting the same on condition that (a) Tenant's and its Subtenants' and invitees' use and quiet enjoyment of the same is not interfered with, and (b) Tenant may require that any inspector be accompanied by a representative of Tenant. With respect to a safety or health-related inspection, 24 hours' prior notice shall not be required, although Landlord shall endeavor to provide as much advance notice to Tenant as is reasonably possible under the circumstances, and Landlord shall give reasonable notice prior to any planned inspection.

Section 14.2  Estoppel Certificates.  Tenant and Landlord shall, at any time and from time to time upon not less than ten (10) days' prior request by the other Party, execute, acknowledge and deliver to Landlord or Tenant, as the case may be, a statement in writing certifying (i) its ownership of the interest of Landlord or Tenant hereunder (as the case may be), (ii) that this Lease is unmodified and in full force and effect (or if there have been any modifications, that the same is in full force and effect as modified and stating the modifications), (iii) the dates to which the Rental and any other charges have been paid, (iv) that, to the best knowledge Landlord or Tenant, as the case may be, no default hereunder on the part of the other party exists (except that if any such default does exist, the certifying Party shall specify such default), and (v) as to any other matters reasonably requested by a Subtenant, Leasehold Mortgagee or third party.

Section 14.3   Release.  If requested by Landlord, Tenant shall upon termination of this Lease, execute and deliver to Landlord an appropriate release, in form proper for recording, of the Memorandum and all Tenant's interest in the Leased Premises, and upon request of Tenant, Landlord will execute and deliver a written cancellation and termination of this Lease and release of all claims in proper form for recording to the extent such release is appropriate under the provisions hereof.

Section 14.4   Landlord's Right to Perform Tenant's Covenants.  If Tenant shall fail in the performance of any of its covenants, obligations or agreements contained in this Lease, other than the obligation to pay Rental, and such failure shall continue without Tenant curing or commencing to cure such failure within all applicable grace, notice and cure periods, Landlord after ten (10) days' additional written notice to Tenant specifying such failure and conspicuously describing that Landlord may perform Tenant's covenants unless Tenant takes action within ten (10) days (or shorter notice if any emergency exists) may (but without any obligation so to do) perform the same for the account and at the expense of Tenant, and the amount of any payment made or other reasonable expenses (including reasonable attorneys' fees incurred by Landlord for curing such default), with interest thereon at the rate of 10% per annum, shall be payable by Tenant to Landlord on demand, or if not so paid, shall be treated at Landlord's option as a monetary default hereunder pursuant to and subject to all of the provisions of Section 9.1 hereof.

Section 14.5   Tenant's Right to Perform Landlord's Covenants.  If Landlord shall fail in the performance of any of its covenants, obligations or agreements contained in this Lease and such failure shall continue without Landlord curing or commencing to cure such failure within all applicable grace, notice and cure periods, Tenant, after ten (10) days' additional written notice to Landlord specifying such failure (or shorter notice if any emergency exists), may (but without obligation so to do) perform the same for the account and at the expense of Landlord,

-40-

and the amount of any payments or other reasonable expenses (including reasonable attorneys' fees) incurred for such purpose, with interest thereon at the rate of 10% per annum, shall be payable by Landlord to Tenant upon demand, or if not so paid, may be deducted from the next payments of Rental becoming due.

Section 14.6 Notices.

(a) Any notice to be given or to be served in connection with this Lease must be in writing, and may be given by (i) actual delivery or (ii) certified or registered mail and shall be deemed to have been given and received either (y) upon actual delivery (if delivered by subsection (i) above) or (z) forty-eight (48) hours after a certified or registered letter containing such notice, properly addressed, with postage prepaid is deposited in the United States mail, addressed as follows:

If to Tenant:

Rangers Ballpark LLC
1000 Ballpark Way, Suite 400
Arlington, Texas 76001
Fax No.: 817-273-5144
Attention: Casey Shilts, Executive Vice President

With a copy to:

McGuire, Craddock & Strother, P.C.
3550 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201
Fax: (214) 954-6868
Attn: Philip I. Danze

If to Landlord:

Arlington Sports Facilities Development Authority, Inc.
City Hall
101 West Abram
Arlington, Texas 76004
Attention: Executive Director

With a copy to:

City of Arlington
City Hall
101 West Abram
Arlington, Texas 76004
Attention: City Manager

With a copy to:

-41-

City of Arlington
City Hall
101 West Abrams
Arlington, Texas 76004
Attention: City Attorney

provided, however, that any Party may at any time change the place of receiving notice by ten (10) days' written notice of such change of address to the other Party in accordance with the manner of giving notice described below.

(b)     If and when included in the term of the "Landlord" as used in this instrument there shall at any time be more than one person, firm or corporation, they shall arrange among themselves for the joint execution of such a notice specifying some Party with its principal place of business in Tarrant County, Texas, for the receipt of notices to Landlord and to which all payments to Landlord shall be made, and payments made by Tenant in accordance with each such notice (until the current arrangement for payment is superseded by the deliver of a different notice) shall constitute payment to all included with the term the "Landlord." If at any time that the rights of Tenant hereunder have passed from the original Tenant, there are included within the term "Tenant" as used in this instrument more than one person, firm or corporation, they shall arrange among themselves for the joint execution of such a notice specifying not more than three Parties, at least one of which must be located at some specific address in Tarrant County, Texas, for the receipt of notices to Tenant. All Parties included within the term the "Landlord" and "Tenant," respectively, shall be bound by notices given in accordance with the provisions of this paragraph to the same effect as if each had received such notice.

Section 14.7    Successor and Assigns.  Except where the context requires otherwise, the word "Tenant" as used in this instrument shall extend to and include the entity executing this Lease, as well as any and all persons or entities who at any time or from time to time during the Term shall succeed to the interest and estate of Tenant hereunder immediate or remote, including any purchaser at any foreclosure sale and successive assignees or successors of the purchaser at any foreclosure sale and grantees or assigns of the leasehold estate in lieu of foreclosure under any Leasehold Mortgage granted by Tenant; and subject to the provisions of Sections 7.1 and 8.5 hereof; all of the covenants, agreements, conditions, and stipulations herein contained which inure to the benefit of or are binding upon Tenant shall inure to the benefit of and shall be jointly and severally binding upon the successors, assigns and grantees of Tenant, and each of them, and any and all persons who at any time or from time to time during the Term shall succeed to the interest and estate of Tenant created hereby.  The phrase "Landlord" as used in this instrument shall extend to and include the named Landlord executing this instrument, as well as any and all persons or entities who at any time or from time to time during the Term shall succeed to the interest and estate of Landlord in the Leased Premises and all of the covenants, agreements, conditions and stipulations herein contained which inure to the benefit of or are binding upon Landlord shall also inure to the benefit of and shall be jointly and severally binding upon the successors, assigns, or other representatives of Landlord, and of any and all persons who shall at any time or from time to time during the Term succeed to the interest and estate of Landlord in the Leased Premises, expressly including the City in the event that it at any time dissolves the Landlord or otherwise takes title to the Leased Premises, in which event, such title shall be taken

-42-

expressly subject to this Lease and the rights of Tenant hereunder. Tenant is an intended beneficiary of the Centerfield Office Building Lease and the Development Property Lease and is entitled to rely thereon and enforce the provisions thereof granting credits or offsets against the Rental owing under this Lease.

Section 14.8   Modifications.   Subject to Section 8.6 hereof, no subsequent agreement amending, supplementing, modifying, waiving or in any way relating to the subject matter of this Lease shall be effective unless set forth in a written instrument making specific reference to this Lease signed by Landlord and Tenant and accompanied by a resolution approving the same adopted by the City Council of the City.   No waiver of any breach of this Lease shall be construed as an implied amendment or agreement to amend any provision of this Lease.

Section 14.9   Descriptive Headings.   The descriptive headings of this Lease are inserted for convenience in reference only and do not in any way limit or amplify the terms and provisions of this Lease.

Section 14.10   Unavoidable Default and Delays.   The time within which either Party hereto shall be required to perform any act under this Lease shall be extended by a period of time equal to the number of days during which performance of such act is delayed unavoidably by strikes, lockouts, acts of God, governmental restrictions, failure or inability to secure materials or labor by reason of priority or similar regulations or order of any governmental or regulatory body, terrorist acts, enemy action, civil disturbance, fire, unavoidable casualties or any other cause beyond the reasonable control of the party seeking the delay.   The provisions of this Section 14.10 shall not operate to excuse Tenant from prompt payment of Rental or any other payments required by the terms of this Lease according to the other express provisions hereof.

Section 14.11   Partial Invalidity.   If any term, provision, condition or covenant of this Lease or the application thereof to any Party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Lease, or the application of such term, provisions, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

Section 14.12   Applicable Law and Venue.   This Lease shall be governed by and construed in accordance with the laws of the State of Texas and, the terms, provisions, obligations and covenants hereof being performable in Tarrant County, Texas.   The Parties hereby agree that venue for any action instituted to enforce the right of either Party hereunder shall be in a court of competent jurisdiction in Tarrant County, Texas.

Section 14.13   Attorneys' Fees.   Should either Party to this Lease engage the services of attorneys or institute legal proceedings to enforce its rights or remedies under this Lease, the prevailing Party to such dispute or proceedings shall be entitled to recover its reasonable attorneys' fees and similar costs incurred in connection with the resolution of such dispute or the institution, prosecution or defense in such proceedings from the other Party.

Section 14.14   Interpretation.   Nothing contained herein shall be deemed or construed by the parties hereto or by any third party as creating the relationship of principal and agent or of

partnership or of joint venture or of any association between the Parties hereto, it being understood and agreed that none of the provisions contained herein or any acts of the Parties in the performance of their respective obligations hereunder shall be deemed to create any relationship between the Parties hereto other than the relationship of landlord and tenant. Nothing contained herein shall be deemed or construed by the Parties hereto or by any third party as creating the relationship of principal or agent between the City and Landlord, it being understood and agreed that none of the provisions contained herein or any acts of the City or Landlord hereunder shall be deemed to create any relationship between the City and Landlord other than as specifically set forth in Section 4B of the Act.

Section 14.15  Net Lease.  It is the intention of Landlord and Tenant that the Rental payable under this Lease after the Commencement Date, and all Impositions and other costs related to Tenant's use or operation of the Leased Premises (other than the portion of the Incremental Funding to be paid from the Admissions Surcharge) shall be absolutely net to Landlord, and that Tenant shall pay during the Term, without (except as otherwise expressly set forth herein) any offset or deduction whatsoever, all such amounts (other than the portion of the Incremental Funding to be paid from the Admissions Surcharge).

Section 14.16  Brokerage Commission.  Landlord and Tenant represent and warrant to each other that no broker commission, finder's fees or similar compensation is due to any party claiming through the representing party in respect of this Lease. Landlord and Tenant shall each defend, indemnify and hold harmless the other from any and all claims for any real estate commission, brokerage fee, or finder's fee occasioned by the purchase or sale of the Property in regard to any claims arising by, through, or under the indemnifying party.

Section 14.17  Short Form.  Landlord and Tenant agree to execute and deliver to each other a short form of this Lease and any amendment thereto in recordable form which incorporates all of the terms and conditions of this Lease or amendment, as applicable, by reference in the form mutually agreed upon by Landlord and Tenant. Landlord and Tenant agree that such short form may be recorded, at Tenant's expense, in the applicable real property records of Tarrant County, Texas but this Lease shall not be recorded.

Section 14.18  Monetary Obligations of Landlord.  Notwithstanding anything to the contrary contained herein, monetary obligations of Landlord hereunder shall be payable solely from lawfully available funds.

Section 14.19  Merger of Estates.  The sublandlord's interest in the Club Sublease is being assigned to Tenant by BRE contemporaneously herewith. The subtenant's interest in the Club Sublease is being assigned to Tenant by TRBP contemporaneously herewith. After giving effect to such assignments, Tenant holds the sublandlord's interest and the subtenant's interest in the Club Sublease. Tenant intends that the subleasehold estate held by Tenant under the Club Sublease be hereby merged into its leasehold estate hereunder. Landlord hereby consents to the merger of such estates.

Section 14.20  Landlord's Lien Waiver.  Landlord hereby waives all landlord's liens that Landlord might hold, statutory or otherwise, to any of Tenant's (or any Subtenant's) inventory,

-44-

trade fixtures, equipment or other personal property now or hereafter placed on the Leased Premises.

Section 14.21 <u>Waiver of Consequential Damages</u>. Notwithstanding anything in this Lease to the contrary, (a) Landlord hereby waives any consequential damages, compensation or claims for inconvenience, loss of business, rents or profits as a result of any injury or damage, whether or not caused by the willful or wrongful act of Tenant or its representatives, agents or employees, and (b) Tenant hereby waives any consequential damages, compensation or claims for inconvenience, loss of business, rents or profits as a result of any injury or damage, whether or not caused by the willful or wrongful act of Landlord or its representatives, agents or employees.

Section 14.22 <u>Principles of Construction</u>. All references to Sections and Exhibits are to Sections and Exhibits in or to this Lease unless otherwise specified. Any reference to "this Section" in this Lease shall mean the Section in which such reference appears, and shall also be deemed refer to the subsections contained in such Section. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Lease, shall refer to this Lease as a whole and not to any particular provision of this Lease. The words "includes," "including" and similar terms shall be construed as if followed by the words "without limitation." Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Definitions contained in this Lease which identify documents, including this Lease, shall be deemed to include all amendments thereto. Tenant acknowledges and agrees that each provision of this Lease for determining charges and amounts payable by Tenant is commercially reasonable and, as to each such charge or amount, constitutes a "method by which the charge is to be computed" for purposes of Section 93.004 of the Texas Property Code, as enacted by House Bill 2186, 77th Legislature. The terms and provisions of this Lease shall not be construed against or in favor of a party hereto merely because such party is "Landlord" or "Tenant" hereunder or such party or its counsel is the draftsman of this Lease.

Section 14.23 <u>Counterparts</u>. This Lease may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. Signatures transmitted by facsimile shall be treated as originals for all purposes hereof

Section 14.24 <u>Entire Agreement</u>. This Lease and the other New Transaction Documents, and the documents executed or delivered in connection therewith constitute the entire understanding and agreement of Landlord and Tenant with respect to the subject matter hereof; and contain all the covenants and agreements of Landlord and Tenant with respect thereto. Landlord and Tenant each acknowledge that no representations, inducements, promises or agreements, oral or written, have been made by Landlord, Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein or therein, and any prior agreements, promises, negotiations or representations not expressly set forth herein or therein are of no force or effect. The Prior Lease and Option Contract are divided, amended, and continued as amended by this Lease, the Centerfield Office Building Lease, and the Development Property Lease.

Section 14.25 <u>Exculpation</u>. All of Tenant's constituent partners, and all of their constituent members, partners, shareholders, officers, directors, employees, participants and

agents are hereby released from all personal liability under this Lease. Tenant's liability, and Landlord's sole means of recourse, hereunder shall be limited to monetary damages for non-payment of rent from Tenant or for failure to maintain the Leased Premises, Tenant's interest in the Leased Premises, and any real estate sales, casualty insurance or condemnation proceeds thereof.

-46-

EXECUTED as of the day and year first above written, but actually executed on the dates set forth in the respective acknowledgments below.

ATTEST:

_Karen Barlay_

Secretary

LANDLORD:

ARLINGTON SPORTS FACILITIES
DEVELOPMENT AUTHORITY, INC.

By: _____

Title: _____

TENANT:

RANGERS BALLPARK LLC,
a Texas limited liability company

By: Texas Rangers Baseball Partners,
     a Texas general partnership,
     in its capacity as Sole Member

     By: HSG Partnership Holdings LLC
     in its capacity as Managing Partner

     By _____
        Casey Shilts, Executive Vice President,
        General Counsel and Secretary

The undersigned hereby acknowledges its approval of this Lease and its agreement with Tenant set forth in Section 1.3(b) above, and its agreement to apply and use the mineral revenues, if any, for the purposes set forth in Section 12.1(g) of this Lease, and its agreement to perform all of the obligations of "Landlord" under Article XIII of this Lease with respect to such of the Development Property owned by the City at the time of the exercise of the Option. :

Attest:                                          CITY OF ARLINGTON, TEXAS

By: _____                       By: _____
    City Secretary                             City Manager
(seal)

                                           Approved as to form:

                                           _____
                                           City Attorney

-47-

STATE OF TEXAS          §

COUNTY OF TARRANT       §

      This instrument was acknowledged before me on the _____ day of _____, by
_____, _____ of Arlington Sports Facilities Development Authority, Inc., a
non-profit development corporation created under and governed by Section 4B of the Texas
Development Corporation Act of 1979, as amended, on behalf of such corporation.


                                                _____
                                                Notary Public in and for the State of Texas

[SEAL]


My Commission Expires:

_____


STATE OF TEXAS          §

COUNTY OF TARRANT       §

      This instrument was acknowledged before me on the 13th day of _____, 2007, by
Casey Shilts, Executive Vice President, General Counsel and Secretary of HSG Partnership
Holdings LLC, a Texas limited liability company, in its capacity as managing partner of Texas
Rangers Baseball Partners, a Texas general partnership, on behalf of such limited liability
company and partnership.


                                         _Dava Poli_____
                                                Notary Public in and for the State of Texas

[SEAL]

My Commission Expires:

DAVA POLI
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 6-23-2010

Dallas 1120590v.20

EXHIBIT A

ARBITRATION PROCEDURES

Section 1.    Arbitration.

1.1    Regular Arbitration. Except for a Dispute or Controversy between Landlord and Tenant that is required to be resolved by Fast-Track Arbitration (defined below), binding arbitration of a Dispute or Controversy shall be conducted in accordance with the following procedures ("Regular Arbitration"):

(a)    The person seeking arbitration hereunder (the "Electing Party") shall request such arbitration in writing, which writing shall be delivered to the other persons to be made parties to such arbitration (the "Other Parties to Arbitration") and include a clear statement of the matter(s) in dispute. If a legal proceeding relating to the matter(s) in dispute has previously been filed in a court of competent jurisdiction (other than a proceeding for injunctive or ancillary relief), then any request to arbitrate under this paragraph shall be delivered within ninety (90) days of the date that the Electing Party receives service of process in such legal proceeding. Except to the extent provided in this Exhibit A, Regular Arbitration shall be conducted in accordance with the Commercial Rules of the American Arbitration Association; if there is any conflict between such Commercial Rules and the terms and provisions of this Exhibit, this Exhibit shall govern. Any arbitration hereunder shall be conducted by a single arbitrator who shall be appointed upon the mutual agreement of the Electing Party and the Other Parties to Arbitration (collectively, the "Parties to Arbitration"; individually, a "Party to Arbitration") within twenty (20) days of the date the written request for arbitration by the Electing Party was delivered to the Other Parties to Arbitration. In order to facilitate any such appointment, the Electing Party shall submit a brief description (no longer than two (2) pages) of the Dispute or Controversy to the Other Parties to Arbitration. In the event the Parties to Arbitration are unable to agree on a single arbitrator within the twenty (20) day period, then the arbitrator shall be appointed by the then-serving administrative judge of the civil trial division of Tarrant County, Texas or any successor thereto within the next ten (10) day period. The Electing Party shall make the request for appointment of an arbitrator and furnish a copy of the aforesaid description of the Dispute or Controversy to said judge. Each Party to Arbitration may, but shall not be required to, submit to said judge a list of up to three (3) qualified individuals as candidates for appointment as the arbitrator whose schedules permit their service as arbitrator within the time periods set forth herein, and the judge shall select the arbitrator from among the individuals proposed by the Parties to Arbitration. No Party to Arbitration shall have any ex parte communications with any nominee or any arbitrator once selected pursuant to this Section 1.1(a).

(b)    Within thirty (30) days of the date the arbitrator is appointed, the arbitrator shall notify the Parties to Arbitration in writing of the date of the arbitration hearing, which hearing date shall be not less than one-hundred twenty (120) days from the date of the arbitrator's appointment. The arbitration hearing shall be held in Arlington, Texas. At the hearing, the testimony of witnesses and experts called by each Party to Arbitration shall be heard. Depositions may be taken and other discovery may be made in accordance with the Texas Rules of Civil Procedure, provided that (i) depositions and other discovery shall be completed

A-1

within ninety (90) days of the appointment of the arbitrator, (ii) there shall be no evidence by affidavit allowed, and (iii) each Party to Arbitration shall disclose a list of all documentary evidence to be used and a list of all witnesses and experts to be called by the Electing Party in the arbitration hearing at least twenty (20) days prior to the arbitration hearing. The arbitrator shall issue a final ruling within thirty (30) days after the arbitration hearing. Any decision of the arbitrator shall state the basis of the award and shall include both findings of fact and conclusions of law. Any award rendered pursuant to the foregoing, which may include an award or decree of specific performance hereunder, shall be final and binding on, and non-appealable by, the Parties to Arbitration and judgment thereon may be entered or enforcement thereof sought by any Party to Arbitration in a court of competent jurisdiction. The foregoing deadlines shall be tolled during the period that no arbitrator is serving until a replacement is appointed in accordance with this Exhibit A.

(c)      Notwithstanding the foregoing, nothing contained herein shall be deemed to give the arbitrator appointed hereunder any authority, power or right to alter, change, amend, modify, waive, add to or delete from any of the provisions of the Lease or any other New Transaction Agreement.

1.2      Fast-Track Arbitration.      The Parties to Arbitration shall agree upon an independent third party who is mutually acceptable to all Parties to Arbitration (the "Fast-Track Arbitrator") and an alternate third party (the "Alternate") to decide a Dispute or Controversy required by the Lease to be resolved by Fast-Track Arbitration. If the Parties to Arbitration are unable to agree on a third party to serve as the Fast-Track Arbitrator or if the Fast-Track Arbitrator or Alternate are unable or fail to act in such capacities, any applicable Dispute or Controversy shall be referred to Regular Arbitration pursuant to Section 1.1 of this Exhibit A. Arbitration known as "Fast-Track Arbitration" shall be conducted in accordance with the following procedures:

(a)      Any Party to Arbitration may refer a Dispute or Controversy required to be resolved by Fast-Track Arbitration by providing written notice to the Fast-Track Arbitrator and the other Parties. Such notice shall include a clear statement of the matter(s) in dispute and a brief description (no longer than two (2) pages) of the Dispute or Controversy. If a Party to Arbitration gives written notice of the referral of such Dispute or Controversy to Fast Track Arbitration, the other Parties to Arbitration shall be bound to enter into Fast-Track Arbitration and may not utilize the procedures of Regular Arbitration, except in the circumstances described in the second sentence of Section 1.2 above or in Section 1.2(d) below). The Parties to Arbitration may also mutually agree (but shall have no obligation) to enter into Fast-Track Arbitration to resolve any other Dispute or Controversy (in addition to those listed above) by providing joint written notice to the Fast-Track Arbitrator. In the event that the Fast-Track Arbitrator is unavailable to resolve the Dispute or Controversy within the time period stated in the next sentence, the Dispute or Controversy shall be referred to the Alternate.

(b)      The Fast-Track Arbitrator or the Alternate, as the case may be (i.e., whichever one serves as the "arbitrator" for the Fast-Track Arbitration), shall be directed to resolve the Dispute or Controversy within fifteen (15) days of the referral, and the arbitrator shall diligently endeavor to resolve such Dispute or Controversy within such fifteen (15) day time

period. The arbitrator shall schedule, and the Parties to Arbitration may attend, a hearing at which the testimony of witnesses and experts called by each Party to Arbitration will be heard. No depositions or discovery shall be permitted, and no evidence by affidavit shall be allowed in such Fast-Track Arbitration proceeding.  Except as set forth in this Exhibit A, Fast-Track Arbitration shall otherwise be conducted in accordance with the Commercial Rules of the American Arbitration Association; provided, however, that the arbitrator may further modify such rules, in a manner consistent with the terms and conditions of this Exhibit A, in order to expedite resolution of the Dispute or Controversy.

(c)    The arbitrator's decision shall be set forth in a written decision that the arbitrator shall furnish to the Parties to Arbitration on the fifteenth (15th) day or, if such day is not a Business Day, the next Business Day. The Parties to Arbitration shall cooperate promptly and in good faith in providing to the arbitrator any information reasonably needed to resolve the Dispute or Controversy within the specified time period.  Unless a Party to Arbitration gives written notice of dissatisfaction with the decision (as permitted under Section 1.2(d) of this Exhibit A, the decision of the arbitrator shall be final and binding on, and non-appealable by, the Parties to Arbitration and judgment thereon may be entered or enforcement thereof sought by any Party to Arbitration in a court of competent jurisdiction.

(d)    The decision of the arbitrator under Section 1.2(c) shall be final and binding on the Parties to Arbitration unless written notice of dissatisfaction with the decision is given by one Party to Arbitration to the other Parties to Arbitration within fifteen (15) days of the date of the written decision of the arbitrator, in which event the Party to Arbitration giving such notice must refer the Dispute or Controversy to Regular Arbitration.

Section 2.    Further Qualifications of Arbitrators; Conduct.    Every person nominated or recommended to serve as an arbitrator pursuant hereto shall be and remain at all times neutral and wholly impartial, and shall have substantial experience and knowledge in the substantive laws applicable to the subject matter of the Dispute or Controversy and shall have substantial experience with issues of such nature concerning multi-purpose public sports and entertainment facilities for professional sports teams, and the public/private relationships and aspects related thereto. All arbitrators shall, upon written request by any Party to Arbitration, provide the Parties to Arbitration with a statement that they can and shall decide any Dispute or Controversy referred to them impartially. No arbitrator shall currently be employed by or represent, or have previously been employed by or represented, a Party to Arbitration or, if not a Party to Arbitration, the Club, the League, any member team of the League, or any affiliates or subsidiaries thereof, or have any material financial dependence upon any such person or Party to Arbitration, nor shall any arbitrator have any material financial interest in the Dispute or Controversy. Further, all arbitrators must meet the qualifications and adhere to the standards of Sections 154.052 and 154.053 of Chapter 154, TEXAS CIVIL PRACTICE AND REMEDIES CODE.

Section 3.    Applicable Law; Limitations on Authority.    The agreement to arbitrate set forth in this Exhibit A shall be enforceable in either federal or state court.  In deciding the substance of any such Dispute or Controversy, the arbitrator shall apply the substantive laws of the State of Texas. The arbitrator may, but shall not be required to, provide for such remedies as

A-3

are available at law or in equity in accordance with the Applicable Laws of the State of Texas, and in accordance with the terms and conditions of the Lease.

        Section 4.      Consolidation. If the Parties to Arbitration initiate multiple arbitration proceedings, the subject matters of which are related by common questions of law or fact and which could result in conflicting awards or obligations, then the Parties to Arbitration hereby agree that all such proceedings may be consolidated into a single arbitral proceeding as determined by the arbitrator in the earliest commenced of the multiple proceedings.

        Section 5.      Pendency of Dispute: Interim Measures. The existence of any Dispute or Controversy eligible for referral or referred to arbitration hereunder, or the pendency of the dispute settlement or resolution procedures set forth herein, shall not, in and of themselves, relieve or excuse any Party to Arbitration from its ongoing duties and obligations under the Lease or any right, duty or obligation arising herefrom; provided, however, that during the pendency of arbitration proceedings and prior to a final award, upon written request by a Party to Arbitration to the arbitrator (with contemporaneous notice thereof to the other Party to Arbitration), the arbitrator may issue interim measures for preservation or protection of the status quo.

        Section 6.      Complete Defense. The Parties to Arbitration agree that compliance by a Party to Arbitration with the provisions of this Exhibit A shall be a complete defense to any suit, action or proceeding instituted in any federal or state court, or before any administrative tribunal by another Party to Arbitration with respect to any Dispute or Controversy which is subject to arbitration as set forth herein, other than a suit or action alleging non-compliance with a final and binding arbitration award rendered hereunder.

        Section 7.      Costs of Arbitrator. The costs and expenses of the arbitrator and the additional incidental costs of arbitration shall be shared equally by all the Parties to Arbitration; provided, however, that if Landlord fails or is unable to pay its share of any such costs or expenses and such failure is continuing beyond the expiration of any cure applicable thereto, then Tenant shall pay such share and the amount so paid by Tenant shall be applied as a credit against the Rentals due under this Lease pursuant to the terms hereof.

Dallas 1120590v.20